STATE OF NORTH CAROLINA v. EDWARD GRADY MACON, JR.

No. 6910SC88

(Filed 22 October 1969)

**1. Criminal Law § 80; Homicide § 15— SBI agent's interrogation notes — inspection by defendant**

In a prosecution for homicide, the trial court properly refused to require the State to produce for defendant's examination the typewritten transcript of notes made by an SBI agent during his interrogation of defendant, where the defendant failed to show that he was taken by surprise or otherwise prejudiced by his inability to inspect the notes prior to trial, and where the notes were not designed as exhibits to be used in the trial, the statute. G.S. 15-155.4, upon which defendant relies relating solely to trial exhibits.

**2. Criminal Law § 167— prejudicial error — burden of proof**

Defendant must not only show error but also must show that the error complained of was prejudicial to him and affected the result adversely to him.

**3. Criminal Law § 101— conduct affecting jury — deputy sheriffs as witnesses and court officers**

In a prosecution for homicide, defendant was not prejudiced by the fact that the trial court allowed two deputy sheriffs who were witnesses for the State to act as court officers during the trial, where there was no suspicious or prejudicial conduct on the part of the officers, neither officer was a key witness for the prosecution, and the jury was not sequestered and placed in the charge of the officers.

**4. Criminal Law § 101— custody of jury — custodian as State's witness**

The practice of putting the jury in the custody of an officer who has actively investigated the evidence or has become a witness for the State is not to be approved.

**5. Criminal Law § 1— proof of crime — corpus delicti**

The proof of every crime consists of (1) proof that the crime charged

has been committed by someone and (2) proof that the defendant is the perpetrator of the crime.

**6. Criminal Law § 106— corroboration of confession — sufficiency of evidence**

The confession must be corroborated by independent evidence of the *corpus delicti;* the corroborative evidence need not be direct, but may be circumstantial, and it is sufficient if the circumstances are such as will, when taken in connection with the confession, establish the prisoner's guilt beyond a reasonable doubt.

**7. Criminal Law § 106— corpus delicti — prima facie case**

To establish a *prima facie* showing of the *corpus delicti* the prosecution need not eliminate all inferences tending to show a non-criminal cause of death.

**8. Homicide § 21— sufficiency of evidence — corpus delicti — skeletal remains — confession — nonsuit**

Evidence of the State tending to show that a skeleton was found near a pond in a rural area, that at the site of the skeleton were the undergarments, the blouse, the ring, the wristwatch and other personal effects which were worn by a woman on the night of her disappearance, and that the perforations in the skull were identified by expert testimony as being compatible with those caused by a bullet and that injury to the brain between the perforations would likely cause death, *is held* sufficient to make a *prima facie* showing of a homicide *corpus delicti;* and such evidence, together with defendant's confession to an SBI agent that he shot the woman with a .38 caliber revolver during an argument and left her body and personal effects in a wooded area, is sufficient to be submitted to the jury upon the question of defendant's guilt of murder in the second degree or of manslaughter.

**9. Homicide § 27— involuntary manslaughter — instructions**

In a homicide prosecution the failure to charge the jury with reference to involuntary manslaughter was not error, since there was no evidential basis for submitting to the jury an issue of involuntary manslaughter.

**10. Homicide § 28— instructions on legal provocation — sufficiency of evidence**

Trial court was not required to charge the jury as to what would be sufficient legal provocation to reduce the crime of second-degree murder to manslaughter, where the State's evidence consisted of defendant's statement to an SBI agent that he and the deceased, a woman, got into an argument, that no blows were passed, and that he shot the deceased with a .38 caliber revolver, and where defendant denied the shooting, denied the statement to the agent, and relied on the defense of alibi.

**11. Criminal Law § 122— additional instructions — question of coercion**

Trial judge's statement at the close of the charge that he would not keep the jury beyond 9 p.m. except at their request and that if the jury had not reached a verdict by that time and did not want to stay longer he would adjourn to the following morning, *held* not to have put undue

pressure upon the jury to hasten their deliberation and to surrender their unbiased judgment.

**12. Criminal Law § 75— admissibility of confession — procedure on voir dire**

Testimony by an SBI agent as to incriminating statements made by the defendant is properly admitted into evidence where the trial court found upon ample evidence on voir dire that the statements were voluntarily and understandingly made after defendant had been advised of his rights as required by *Miranda v. Arizona,* 384 U.S. 436.

**13. Criminal Law § 76— confession — question of fact — jury**

Whether or not the defendant made the incriminating statements admitted in evidence is a question of fact to be determined by the jury.

APPEAL by defendant from *McKinnon, J.,* 8 July 1968 Session, WAKE Superior Court.

Defendant was brought to trial upon a bill of indictment, proper in form, charging him with the first-degree murder of Jane Ellen Smith on 31 July 1967. Upon the case being called for trial, the solicitor for the State announced in open court that the State would not seek a verdict of guilty of murder in the first degree, but would seek a verdict of guilty of murder in the second degree or of manslaughter as the jury may find. Defendant entered a plea of not guilty and was tried by jury.

The State offered evidence which tended to show the following:

Jane Ellen Smith was married to Carl D. Smith and lived at Route 3, Apex, North Carolina. On 31 July 1967 (a Monday) she left home about 7:15 to 7:30 p.m. in her husband's 1956 Ford to go to the store. She was attired in a blouse, shorts and leather-strap sandals; she also had on her high school class ring with her initials in the band, and a Miss America Bulova wristwatch. Because she did not return home at any time that night her husband and sister called a deputy sheriff in Apex, informing him that Jane Ellen Smith was missing and giving him a description of what she was wearing and driving when she left home. The automobile was later found parked about three miles from Apex.

A little over seven months later, on 10 March 1968, a skeleton was found near Oscar Jones' pond near Holly Springs in the southern portion of Wake County. This pond lies approximately one mile east of Highway 55, approximately two miles north of Holly Springs, and approximately five miles southwest of Apex. The bones of the skeleton were widely scattered and appeared to have been gnawed upon; numerous small bones, such as some of the digits of the hands

and feet, were missing. The skull, the larger bones, and many of the smaller bones were recovered. Also at the site of the skeleton were the undergarments, the blouse, the shorts, the sandals, the ring, and the wristwatch which were worn by Jane Ellen Smith when she left home in the evening of 31 July 1967.

The skeleton was compatible with that of an adult female; and in the opinion of Doctor Laurin J. Kaasa, an expert in the field of pathology, was the skeleton of an adult female human being. The undergarments found at the site of the skeleton, in the opinion of Mr. Glen Glesne, a laboratory analyst, contained some human hairs of caucasian characteristics and of such characteristics as to indicate it was pubic hair. The skull had two holes, one on the left side and one on the right. The hole on the left side was smaller than on the right, and the hole on the right had portions around the rim which had the appearance of being blown outward by a force projecting through from left to right and going out at the right side. In the opinion of Doctor Kaasa, this type of perforation of the skull was compatible with that caused by a bullet, and injury to the brain that lies between the two holes would likely cause death. Small metalic fragments were removed from inside the skull which were analyzed to be lead and copper.

Prior to 31 July 1967 defendant had been acquainted with Jane Ellen Smith. He had been observed frequently driving along the road in front of her house, looking towards her house. He had been observed by Jane Ellen Smith's sister on two occasions when he stopped to pick her up in front of her house. Jane Ellen Smith's fourteen-year-old daughter had gone with her on several occasions when she drove to meet defendant at some other place; twice when they met in the woods on the road leading from Highway 55 to Oscar Jones' pond. During the late afternoon of 31 July 1967 defendant was observed passing Jane Ellen Smith's house and looking towards the house.

On 7 October 1967 defendant traded a .38 caliber Charter Arms pistol (serial number 5744) for a .38 caliber Smith and Wesson, model ten.

The State also offered evidence which tended to show that on 16 March 1968 defendant told Special Agent Robert D. Emerson of the State Bureau of Investigation that he knew and associated with Jane Ellen Smith; that he formerly resided in Apex; that during the mid-summer of 1967 he was associating with her and that he had sexual relations with her on at least one occasion; that on one night during the mid-summer of 1967 he met Mrs. Smith on Highway 64

near Apex; that she parked her automobile and got into his 1955 Chevrolet with him; that he drove with her south of Apex down Highway 55 and parked off of Highway 55; that they drank some beer which he had with him; that he and Jane Ellen Smith got into an argument, a verbal argument; that no blows were passed between the two of them; that he had a .38 caliber revolver in the automobile with him and that he used the revolver and shot Jane Smith; that he took the body and left it in a wooded area off of Highway 55; left the area, leaving her personal effects with the body, drove to Fuquay and left Fuquay and returned to Wake Forest, where he was staying; that he did not see why he had to suffer for the death of Jane Ellen Smith; that she was a slut and led him on and that she was not worth a tinker's dam; that to the best of his knowledge the .38 caliber Charter Arms pistol (serial number 5744) was the weapon he used to shoot Jane Ellen Smith.

The defendant offered evidence which tended to show the following:

Defendant is forty-nine years of age, married and has four children. He lived in Apex and was employed by the Durham and Southern Railway until 15 November 1966. He first met Jane Ellen Smith when he talked with her about the crossing over the Durham and Southern tracks between her house and the paved road. Later he went with her three times. The last time he went with Jane Ellen Smith was on 24 July 1967. At that time he stopped to pick up someone flagging him down, at the intersection of Highways 1 and 64 south of Raleigh; it turned out to be Jane Ellen Smith. He took her to get some beer, drove down Highway 55 south of Apex, parked opposite the gas pipeline terminal, drank the beer and proceeded on down Highway 55 to Fuquay-Varina. When they arrived at the north end of Fuquay-Varina, Jane Ellen Smith wanted more beer, but he refused to take her to get more. She got out of the car to walk on into town, and defendant continued on down Highway 55. He has not seen Jane Ellen Smith since that time. On 30 July and 31 July 1967 (Sunday and Monday) defendant was staying in Wake Forest with his sister, mother, and grandmother. He was working at that time for the Seaboard Railway, assigned to work out of Henderson. On 31 July 1967, upon getting off work at four o'clock, defendant went straight to Wake Forest, rested for awhile, ate supper, watched television, and went to bed for the night. Defendant did not go to the vicinity of Apex or Holly Springs on 31 July 1967, and has never told anyone that he did. He did not tell the officers that he shot Jane Ellen Smith; he had no ill feelings towards her nor any desire to have her out of the way.

The jury returned a verdict of guilty of second-degree murder, and a sentence of not less than twenty nor more than thirty years was imposed. Defendant appealed.

*Attorney General Robert Morgan and Assistant Attorney General Millard R. Rich, Jr., for the State.*

*Hatch, Little, Bunn & Jones, by E. Richard Jones, Jr., for defendant appellant.*

PARKER, J.

[1]   Defendant assigns as error that the trial court refused to require the State to produce for examination by defendant the typewritten transcript of notes made by S.B.I. Agent Emerson during the interrogation of defendant on 16 March 1968.

By written motion dated 25 June 1968, defendant moved the court to require the State to produce for inspection by defendant the following:

1.   Jewelry and clothing alleged to have been worn by Jane Ellen Smith on 31 July 1967.

2.   Any pistol or other weapon alleged to have been used in the alleged crime; together with any bullet discovered in or near the remains recovered on 10 March 1968 in Holly Springs Township.

3.   Vacuum sweepings or other items taken from any automobile formerly owned by the defendant.

4.   Typewritten transcript of notes made by S.B.I. Agent Emerson during the interrogation of defendant on 16 March 1968.

5.   Autopsy report of medical examiner and pathologist as to the remains recovered on 10 March 1968.

By order dated 28 June 1968, Bickett, J., required the State to produce the items requested in paragraphs 1, 2, 3 and 5 of the motion for inspection by defendant. With respect to the item requested in paragraph 4 of the motion, Bickett, J., ruled as follows:

"And it appearing to the court that the article enumerated as Article (of) (E)vidence Number 4 in the defendant's motion is not a transcribed and signed confession of the defendant, but rather the personal notes taken pursuant to the investigation and interrogation of the defendant by S.B.I. Agent Emerson, and it further appearing to the court that the defendant's attorney has had ample opportunity to cross examine S.B.I. Agent Emerson at the preliminary hearing; therefore, the court is of

the opinion that the defendant is not entitled (to inspect the) typewritten transcript of notes made by S.B.I. Agent Emerson during the interrogation of the defendant on March 16, 1968."

Defendant relies primarily on the provisions of G.S. 15-155.4 as giving him the right to inspect the transcribed notes of the interrogating officer. However, the statute relied upon provides that prior to the issuance of an order for inspection ". . . the accused or his counsel shall have made a written request to the solicitor or other counsel for the State for such inspection. . . ." Nowhere is it shown that defendant made such a request. Also the statute relied upon relates to the inspection of ". . . any specifically identified exhibits to be used in the trial. . . ." The interrogating officer's notes were not designed as exhibits to be used in the trial, nor were they offered to corroborate the officer's testimony as a prior consistent statement. It is noteworthy that on the *voir dire* examination of Agent Emerson, counsel for defendant made no inquiry concerning the interrogation notes nor of their contents. Additionally, it does not appear that S.B.I. Agent Emerson used the transcribed notes during his testimony, nor does it appear that they were mentioned before the jury until upon cross-examination when defense counsel questioned him about taking notes and asked if he had them with him.

**[1, 2]**   We do not need to decide whether under proper circumstances a defendant is entitled to inspect the notes taken by an officer during interrogation of defendant. If we concede *arguendo* that the trial court committed error in its refusal to allow the inspection, defendant has failed to show any prejudice from such error. According to Judge Bickett's unchallenged finding defendant had ample opportunity to cross-examine the officer about the notes during the preliminary hearing. Defendant had ample opportunity to cross-examine the officer about the notes in the absence of the jury during the *voir dire;* but he must have deemed it unnecessary because he did not do so. But, primarily, defendant has failed to point out to us any way in which he was taken by surprise or otherwise prejudiced by his inability to inspect the notes before trial. Defendant must not only show error but also must show that the error complained of was prejudicial to him and affected the result adversely to him. 3 Strong, N.C. Index 2d, Criminal Law, § 167, p. 126. This assignment of error is overruled.

**[3]**   Defendant assigns as error that the trial court allowed Deputy Sheriff Connie Holmes and Deputy Sheriff W. L. Pritchett, who were witnesses for the State, to act as court officers during the trial. Defendant relies strongly upon *Turner v. Louisiana,* 379 U.S. 466, 13

L. Ed. 2d 424, 85 S. Ct. 546. In *Turner,* the jury was sequestered, and placed in charge of deputies who accompanied the jury to meals and to their lodgings and two of those deputies were the principal witnesses for the State. The court rightly observed that ". . . it would be blinking reality not to recognize the extreme prejudice inherent in this continual association throughout the trial between the jurors and these two key witnesses for the prosecution." *Turner v. Louisiana, supra.*

However, in the present case neither Deputy Holmes nor Deputy Pritchett was a "key witness" for the prosecution. It was the testimony of S.B.I. Agent Emerson which connected defendant with the crime. Also, in the present case the jury was not sequestered nor were the two deputies placed "in charge" of the jury. It is true that both of them from time to time performed the function of courtroom deputy or bailiff, but there was no suspicious or prejudicial conduct.

Immediately after the jury was impaneled counsel for defendant lodged their objection to these two deputies acting as courtroom deputies, which objection the trial judge overruled. Later the trial judge made the following findings: "After this objection was made, no further objection or suggestion of improper contact was made during the trial, and as a result of the objection the court observed the conduct of the officers and observed no improper conduct. The jury was not sequestered and the only services of these officers in connection with the jury was in opening the door to send them out or call them in as occasion required."

[4]    Although this assignment of error is overruled we think it appropriate to reiterate here what was said in *State v. Taylor,* 226 N.C. 286, 37 S.E. 2d 901. "The practice of putting the jury in the custody of an officer who has actively investigated the evidence or has become a witness for the State is not to be approved. While, in the absence of evidence of some fact or circumstance tending to show misconduct on the part of the officer or the jury, we hesitate to make it alone the grounds for a new trial, we do stress the need for trial judges to be extremely careful to avoid such incidents. However circumspect the officer and jurors may be when placed in such a situation, these occurrences always, as here, tend to bring the trial into disrepute and produce suspicion and criticism to which good men should not be subjected." See also, *State v. Hart,* 226 N.C. 200, 37 S.E. 2d 487. This assignment of error is overruled.

Defendant assigns as error that his motion for nonsuit was de-

nied. He contends there is insufficient evidence *aliunde* the confession to carry the case to the jury.

**[5, 6]**   "The proof of every crime consists of: (1) proof that the crime charged has been committed by someone; and (2) proof that the defendant is the perpetrator of the crime. The first element is the body of the crime, or the *corpus delicti;* the second is the proof of defendant's connection with the crime, *i.e.,* his guilty participation or agency therein." Wharton's Criminal Evidence (12th Ed.), Vol. 2, § 393, p. 130. In North Carolina it is required that ". . . the confession be 'corroborated' by independent evidence of the *corpus delicti.* By this is meant, evidence that the offense charged was committed by someone, not necessarily by the defendant himself. The corroborative evidence need not be direct; it may be circumstantial, and it is sufficient (if) the circumstances are such 'as will, *when taken in connection with the confession,* establish the prisoner's guilt in the minds of the jury beyond a reasonable doubt." Stansbury, N.C. Evidence 2d, § 182.

**[7]**   To establish a *prima facie* showing of the *corpus delicti* the prosecution need not eliminate all inferences tending to show a non-criminal cause of death. "Rather, a foundation (for the introduction of a confession) may be laid by the introduction of evidence which creates a reasonable inference that the death could have been caused by a criminal agency . . . even in the presence of an equally plausible non-criminal explanation of the event (citing cases)." *State v. Hamilton,* 1 N.C. App. 99, 160 S.E. 2d 79.

**[8]**   We hold that the evidence introduced by the State, independent of the confession, was sufficient to create a reasonable inference that Jane Ellen Smith's death *could have been* caused by a criminal agency and was therefore sufficient to make out a *prima facie* showing of *corpus delicti.* This independent evidence of *corpus delicti,* together with defendant's confession, was sufficient to require submission of the case to the jury upon the question of defendant's guilt. *State v. Moore,* 275 N.C. 141, 166 S.E. 2d 53. This assignment of error is overruled.

**[9]**   Defendant assigns as error the court's charge to the jury that the question of involuntary manslaughter was not before them in this case. In this there was no error. S.B.I. Agent Emerson, a witness for the State, testified that the defendant had told him that he and Jane Smith "got into an argument, a verbal argument, that no blows were passed between the two of them; that he had a .38 caliber revolver in the automobile with him and that he used the revolver and shot Jane Smith; that he took the body and left it in

a wooded area off of Highway 55." There was no evidence that the shooting occurred in any other manner; defendant's evidence was that he had never shot Jane Smith at all and that he had never told the officers that he did. There was no evidential basis for submitting to the jury an issue of involuntary manslaughter. *State v. Price,* 271 N.C. 521, 157 S.E. 2d 127; *State v. Hamilton, supra.*

[10]  Defendant assigns as error that the court failed adequately to charge the jury as to what would be sufficient legal provocation to reduce the crime from second-degree murder to manslaughter. There was in this case, however, no evidence of any legal provocation. The only evidence for the State as to how the killing occurred is quoted above. The defendant denied the shooting, denied his statement, and relied on alibi. On the evidence the court was not required to charge as to what might constitute legal provocation sufficient to reduce the crime of second-degree murder to manslaughter. Insofar as the court referred to the matter of legal provocation at all in its instructions to the jury, the charge could only have been beneficial to defendant, not harmful, and no prejudicial error is shown.

[11]  At the close of his charge, the trial judge, after instructing the jury that their verdict must be unanimous, stated:

> "I would like to say, members of the jury, consistent with my statement made earlier, I will not keep you here beyond 9:00 o'clock, except by your request. If you have not reached a verdict by approximately 9:00 o'clock, I will make inquiry and if you have not and do not want to stay longer, we will recess for the evening and come back tomorrow; . . ."

Defendant contends this statement tended to put undue pressure upon the jury to hasten their deliberations and to surrender their unbiased judgment, thereby depriving him of a fair and impartial trial. There is no merit to this contention. Here, unlike the situation presented in *State v. McKissick,* 268 N.C. 411, 150 S.E. 2d 767, the jury had not begun their deliberations when the challenged instruction was given; hence the statement was not made to get the jurors of one mind. Nothing in the challenged statement in the present case could have been rationally interpreted by any juror as coercive. On the contrary, the able judge was making it clear that he was not placing any time limitation upon the jury's deliberations, nor would he insist that they remain in session until an inconveniently late hour in the night. In stating that he would consult with and follow the jury's wishes in the matter, the trial judge placed no pressure upon any juror to surrender his independent judgment nor upon the

jury as a whole to hasten its deliberations, and the defendant was not deprived of a fair trial.

**[12, 13]** Defendant's final assignments of error relate to the admission in evidence of the testimony of the State's witness, S.B.I. Agent Emerson, as to the incriminating statements made by the defendant. This testimony was admitted only after the trial judge had conducted an extensive *voir dire* examination in the jury's absence, at the conclusion of which the court made findings of fact that any statements made by defendant to the officers were made voluntarily and understandingly, without coercion, duress, promise, or threat, and after the defendant had been advised of his rights as required by the *Miranda* decision. These findings of fact are fully supported by the evidence taken on the *voir dire* examination and the trial court fully complied with the procedures prescribed in *State v. Gray*, 268 N.C. 69, 150 S.E. 2d 1, for determining the admissibility in evidence of an extrajudicial confession. It is significant that the defendant himself testified in the *voir dire* examination that prior to questioning him S.B.I. Agent Emerson had advised him that he had a right to an attorney and that he could remain silent. The defendant testified before the jury that he had not made the statements attributed to him. Whether the defendant did or did not make the incriminating statements was a question of fact to be determined by the jury from the evidence admitted in its presence. *State v. Gray, supra; State v. Guffey*, 261 N.C. 322, 134 S.E. 2d 619. By its verdict the jury obviously found against defendant's contentions.

In the entire trial we find

No error.

MALLARD, C.J., and BRITT, J., concur.