392 S.E.2d 67 (1990)
326 N.C. 67
STATE of North Carolina
v.
Arthur L. McELROY.
No. 275A88.
Supreme Court of North Carolina.
June 13, 1990.
Lacy H. Thornburg, Atty. Gen. by David Roy Blackwell, Sp. Deputy Atty. Gen., Raleigh, for the State.
Malcolm Ray Hunter, Jr., Appellate Defender by Staples Hughes, Asst. Appellate Defender, Raleigh, for defendant.
FRYE, Justice.
Defendant presents two issues on appeal: (1) whether the trial court erred in allowing the State to introduce testimony that defendant practiced martial arts exercises and possessed weapons; and (2) whether the trial court erred in allowing one of the state's witnesses to testify concerning the witness' understanding of what defendant meant when he warned the witness not to tell anyone about what had happened. We need not decide the first issue because, even if it was error to introduce the evidence concerning defendant's participation in martial arts exercises and possession of weapons, it was harmless error. With regard to the second issue, we conclude that the trial court did not err.
In a proper indictment, defendant was charged with first degree murder in the death of Mickey Johnson. The case was tried as a non-capital case. The evidence and the testimony presented at trial tended to show that the victim boarded in the home which defendant shared with his mother. On the evening of 31 October 1986, defendant and James Rutherford, who worked with defendant as a house *68 painter, had dinner at the home of some friends. Both defendant and Rutherford drank two or three beers and a wine cooler and then smoked some marijuana before defendant left to go to his own home. After defendant left, Rutherford remained at the friend's home and fell asleep on the couch in the living room of the home.
Defendant, who is a diabetic, called Rutherford at the friend's home about 4:00 or 4:30 a.m. that morning and asked Rutherford to come to his house because he was having a diabetic attack and wanted someone there who could call an ambulance if he got worse. Rutherford testified that when he arrived at defendant's home, he observed a window pane broken out of the door leading to the kitchen. When Rutherford entered the kitchen, Mickey Johnson was slumped in a chair by the refrigerator. Johnson's eyes were closed, and blood was coming from his chest. Rutherford testified that defendant entered the room with a .22 caliber rifle and told Rutherford, "I'm going to finish him off." Rutherford said that defendant then fired two shots into the victim, stopping to reload between the two shots.
When he was arrested, Rutherford gave a written statement to the police. In this written statement, Rutherford told the police that he saw defendant fire only one shot at the victim and that before he fired this shot, defendant said, "I want to make sure he's dead." Rutherford testified that while he had read the statement before signing it, he had actually told the officer that he saw defendant fire two shots, but the officer did not write it down correctly. At trial, Pete Tindall, one of defendant's witnesses, testified that Rutherford had told him that Rutherford only saw defendant fire one shot at the victim, and that was a shot to the victim's head. The medical examiner testified that the victim had two gunshot wounds to the left chest, which had caused the victim's death, and a superficial wound to the head.
According to Rutherford, defendant told him that he had been awakened by the sound of a window smashing. Defendant said that when he awoke, he began shaking and could not move. Rutherford said that defendant told him the victim, who was very drunk at the time, came into defendant's room with a knife, waving it, and saying, "You want to cut me? Cut me now. I doubt it. I doubt it." The victim was six feet, two inches tall and weighed about 165 pounds. Defendant is about five feet, four inches tall and weighs about 120 to 125 pounds.
Rutherford testified that after he arrived at defendant's home, defendant's eyeballs kept moving from left to right "like he was paranoid." Rutherford further testified that defendant was acting upset and confused and could not stop shaking. Defendant offered evidence through the testimony of a physician, who is a specialist in endocrinology, that he had been a diabetic for fourteen years and that in the preceding months, he had had repeated episodes of hypoglycemia characterized by a decrease in consciousness. One of these episodes had resulted in a probable seizure and an emergency room visit in August 1986.
According to Rutherford's testimony, after defendant shot Johnson, defendant asked Rutherford to help him carry the body to the house next door. Rutherford assisted as requested, and the two men dropped the body on a pile of sheetrock. Defendant then covered the body with more sheetrock, and defendant and Rutherford returned to defendant's house. Before they left defendant's house with the body, defendant warned Rutherford not to tell anyone about what he had seen. Defendant repeated this warning to Rutherford when they returned to the house after leaving the body next door. Johnson was reported missing in November 1986, but his body was not found until December 1986.
Defendant was questioned about the death and gave the detective a full written statement after being advised of his rights. In this statement, defendant told the police that he had gotten home from a party about 1:00 a.m. the morning of 1 November 1986 and had gone to bed after smoking a cigarette. He related that he was awakened by a voice which sounded like *69 Johnson. Defendant claimed that he forced himself to get up and walked into the hallway. There he stepped on a drop of blood. In his statement, defendant said that he drank seven-up and sugar until he "started coming around." After he saw the broken glass and the knife, he called Rutherford.
Defendant did not testify at trial, but he did present evidence at trial through the testimony of Susan Willis, the girlfriend of the victim; Pete Tindall, a friend of defendant; and Dr. Mary K. Lawrence, the specialist who had treated defendant for his medical problems. After being instructed on first degree murder, second degree murder, and manslaughter, the jury returned a verdict of guilty of first degree murder. The trial court imposed a sentence of life imprisonment, and defendant appeals from this conviction.
The State questioned Rutherford, its chief witness, about defendant's participation in kick boxing and other martial arts activities and about defendant's interest in weapons. Rutherford's testimony was that defendant practiced twice a week with certain martial arts weapons such as nunchucks, throwing stars, or tripod weapons and defendant practiced kick boxing with a large bag tied in a tree in his backyard. Rutherford also testified that defendant owned a .25 caliber firearm and that he watched many martial arts films. This testimony was admitted over defendant's objections. Defendant also objected to the State's questioning during the cross-examination of Pete Tindall concerning defendant's kick boxing practice and defendant's use of martial arts weapons.
When defendant objected to Rutherford's testimony concerning defendant's involvement with martial arts activities and moved to strike some of that testimony from the record, the trial judge stated, "We receive this evidence for any purported claims by the Defendant in respect to self-defense. It is received for that limited purpose only." Defendant contends that this evidence is irrelevant to his self-defense claim and that the trial judge erred in admitting it. Defendant further contends that this evidence was extremely prejudicial and, while defendant did not place his character in issue, this evidence was almost certainly taken by the jury as probative of character for violence and aggression. In support of these contentions, defendant cites State v. Morgan, 315 N.C. 626, 340 S.E.2d 84 (1986), for the proposition that evidence of extrinsic acts which are arguably violent or aggressive in nature are inadmissible on the issues of whether a defendant asserting self-defense at trial was the aggressor, of whether he feared the deceased, of whether he believed it necessary to exercise deadly force, or of whether such belief was reasonable.
We find it unnecessary to discuss defendant's contentions relative to this issue because, even assuming arguendo that the admission of this testimony was improper, the error was harmless in light of the other evidence presented at trial. Even if defendant proves error in the trial court's ruling, relief will not ordinarily be granted absent a showing of prejudice. State v. Herring, 322 N.C. 733, 370 S.E.2d 363 (1988). "A defendant is prejudiced by errors ... when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises. The burden of showing such prejudice under this subsection is on the defendant." N.C.G.S. § 15A-1443(a) (1988).
The State presented evidence that the victim was shot three times by a .22 rifle which had to be reloaded each time before the next shot could be fired. The evidence further revealed that defendant shot the victim at least one time after Rutherford arrived and after defendant told him either, "I want to make sure he's dead," or "I'm going to finish him off." Rutherford also testified that the victim was alive at the time Rutherford arrived at defendant's home because the victim was slumped over in the chair in the kitchen, and he was snoring. Defendant fired at least one shot at the victim after stating words to the effect that he was going to make sure the victim was dead. The substantial evidence *70 presented by the State clearly indicated that defendant shot and killed Johnson with premeditation and deliberation. Therefore, it is highly unlikely that the jury would have reached a different verdict had the testimony about defendant's training in martial arts and possession of weapons not been admitted, and the admission of this evidence, even if error, was harmless error. See N.C.G.S. § 15A-1443(a).
In his second assignment of error, defendant contends that the trial court improperly allowed Rutherford to testify as to Rutherford's understanding of defendant's intention from a statement he made to Rutherford. During the State's direct examination of Rutherford, the following exchange took place:
Q. Now, other than attempting to clean up the blood in the house, what was Arthur doing?
A. Cleaning it up and telling me what happened.
Q. And that's what you have already told us?
A. Yes.
Q. Did he tell you anything about you remaining silent?
A. No. He just told me that if I said anything that, you know, what would happen.
Q. What did you understand him to mean by, "you know what will happen?"
[Objection by defense counsel overruled.]
THE WITNESS: That he was going to shoot me or whatever, kill me.
Defendant contends that this testimony was inadmissible because a witness may not give his opinion of another person's intention on a particular occasion.
Rule 701 of the North Carolina Rules of Evidence deals with opinion testimony of non-expert witnesses. The rule provides:
If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.
N.C.G.S. § 8C-1, Rule 701 (1986). In support of his contention that this testimony is inadmissible under this rule, defendant states the general rule found in 1 Brandis on North Carolina Evidence § 129 (3rd ed. 1988), that a witness may not give his opinion of another person's intention on a particular occasion. In further support of this contention, defendant cites State v. Sanders, 295 N.C. 361, 245 S.E.2d 674 (1978).
In Sanders, the defendant was appealing a ruling by the trial judge excluding the testimony of three defense witnesses who were to testify as to why they thought the officers entered the holding cell prior to the stabbing death for which defendant was on trial. Id. at 369, 245 S.E.2d at 680. The witnesses would have testified that they thought the officers went to the cell to "beat up" the defendant. Id. at 369, 245 S.E.2d at 680-81. This Court held in Sanders that this testimony was inadmissible because, while the witnesses could tell the jury what the officers did as they entered the cell, they were no more qualified than the jury to conclude what the officers intended to do when they entered the cell. Id. at 370, 245 S.E.2d at 681. However, in the present case, defendant spoke directly to Rutherford which placed Rutherford in a better position to tell the jury what that statement meant to him than the witnesses in Sanders. In Sanders, the witnesses were merely speculating as third parties as to what the officers were going to do to the defendant when the officers entered the cell. Rutherford, on the other hand, was asked to tell what defendant's statements meant to Rutherford himself.
Rutherford's testimony meets the requirements of Rule 701 in that it was both rationally based on his perception and helpful to the jury. Rutherford was explaining what the statement meant to him and thus what effect it had on him, and this testimony was helpful in explaining why Rutherford did not immediately report Johnson's death to law enforcement authorities. His *71 testimony was properly admitted under Rule 701.
For the reasons stated herein, we find no prejudicial error in defendant's trial.
NO ERROR.