STATE OF NORTH CAROLINA v. ANTHONY GEORGE SHOOK

No. 249A88

(Filed 26 July 1990)

1. **Criminal Law § 106.4 (NCI3d) — noncapital case — confession — proof of corpus delicti unnecessary — independent evidence of trustworthiness**

     Where the State relies upon a confession to obtain a conviction in a noncapital case, it is not necessary that there be independent proof tending to establish the corpus delicti of the crime charged if the accused's confession is supported by substantial independent evidence tending to establish its trustworthiness, including facts that tend to show the defendant had the opportunity to commit the crime.

     **Am Jur 2d, Homicide § 530.**

2. **Criminal Law § 106.4 (NCI3d) — confession — independent evidence of trustworthiness**

     Defendant's confession in which he stated that he improperly mixed the victim's medication with the intent to cause her death was supported by sufficient independent evidence of its trustworthiness to be admissible in this murder trial where the State presented evidence tending to show that, although the victim was extremely ill, she remained in a relatively stable condition with her blood pressure at a reasonable level if she received intravenous infusions of the prescribed doses of norepinephrine or epinephrine; at the time of the victim's death, the solution she was receiving intravenously contained

STATE v. SHOOK

[327 N.C. 74 (1990)]

no norepinephrine; when the victim did not respond to the solution labeled as containing norepinephrine, she was switched to a different solution labeled as containing epinephrine; however, that solution was not effective since it only contained one-tenth of the prescribed amount of the epinephrine indicated on the label; each solution had been prepared and labeled by the defendant, a nurse; and the uncontroverted cause of the victim's death was the removal of pharmacological support and the resulting drop in her blood pressure.

**Am Jur 2d, Homicide § 530.**

3. **Homicide § 30.3 (NCI3d)— first degree murder—instruction on involuntary manslaughter not required**

In a prosecution of a nurse for first degree murder of a hospital patient who died as a result of having her life-sustaining medication withheld, there was insufficient evidence that defendant negligently and unintentionally withheld medication from the victim so as to require the trial court to instruct the jury on the lesser included offense of involuntary manslaughter where defendant simply testified at trial that he had not prepared the victim's medication or done anything else wrong, either intentionally or unintentionally; and defendant indicated in a pretrial statement to SBI agents that he knowingly withheld the victim's medication with the intent to cause her death, but that he did so "spontaneously."

**Am Jur 2d, Homicide § 511.**

4. **Criminal Law § 50.2 (NCI3d)— witness's perception of defendant's state of mind—admissible nonexpert opinion**

In a prosecution of a nurse for first degree murder of a hospital patient by withholding the patient's life-sustaining medication, testimony by the victim's husband that "[i]t seemed like [defendant's] attitude toward me was like he was wanting me to give up on her" was admissible under N.C.G.S. § 8C-1, Rule 701 since the testimony went not to defendant's intent but simply related the witness's perception as to defendant's state of mind and the effect it had on the witness, and the testimony was helpful to the jury in explaining the witness's testimony as to why he subsequently asked the hospital not to assign defendant to care for his wife.

STATE v. SHOOK

[327 N.C. 74 (1990)]

**Am Jur 2d, Homicide § 282.**

Justice WEBB concurring.

APPEAL of right pursuant to N.C.G.S. § 7A-27 from judgment entered by *DeRamus, J.,* in the Superior Court, FORSYTH County, on 25 February 1988, sentencing the defendant to life imprisonment for murder in the first degree. Heard in the Supreme Court on 13 December 1989.

*Lacy H. Thornburg, Attorney General, by William N. Farrell, Jr., Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Staples Hughes, Assistant Appellate Defender, for the defendant-appellant.*

MITCHELL, Justice.

The defendant was tried in a noncapital trial upon a true bill of indictment charging him with the murder of Peggy Lou Epley. The trial court submitted and instructed the jury on possible verdicts finding the defendant guilty of first-degree murder or not guilty. The jury found the defendant guilty of first-degree murder on the theory that the killing was premeditated and deliberate. The District Attorney having announced that there was no evidence of aggravating circumstances, the trial court sentenced the defendant to life in prison.

The State's evidence at trial tended to show that Peggy Epley was placed in the intensive care unit of the North Carolina Baptist Hospital in Winston-Salem due to renal failure. She was moved in and out of the intensive care unit five times prior to her death. During October 1986, Peggy Epley's life was maintained by a ventilator, dialysis, and intravenous infusions of blood pressure medication.

On 8 October 1986, the defendant, a registered nurse, specifically asked to care for Peggy Epley during his shift. Having been advised of the patient's condition by Nurse Scott, the defendant stated, "[w]ell, you know, one of these days her blood pressure is going to drop and she's not coming back." During the early morning of 9 October 1986, the patient's blood pressure began to drop. The defendant managed to raise her blood pressure by increasing the rate of infusion of norepinephrine, a blood pressure medication. She remained stable until 6:00 a.m. At this time, the defendant

prepared and administered a new bottle of norepinephrine. The defendant also prepared a backup solution of epinephrine, to be used if the patient failed to respond to the norepinephrine. Meanwhile, the patient's blood pressure remained stable.

The defendant was relieved around 7:00 a.m. by Nurse Bryant. The defendant informed Nurse Bryant about Epley's condition. He also informed Nurse Bryant that he had prepared a new infusion of norepinephrine which was being administered to the patient at that time. Further, he pointed out that he had mixed a backup solution of epinephrine which was ready for use if there was a problem. Having been relieved, the defendant then left the hospital.

Around 8:15 a.m. on 9 October 1986, Epley's blood pressure dropped. Her blood pressure continued to drop despite increased rates of infusion of the norepinephrine solution which the defendant had mixed. Since Epley did not respond to the norepinephrine solution, she was switched to the backup solution containing epinephrine. As with the norepinephrine, the patient did not respond to the infusion of epinephrine which the defendant had mixed. Eventually, the patient died due to a loss of blood pressure.

Suspecting that something was wrong with the norepinephrine and epinephrine solutions prepared by the defendant, state authorities sent samples of the solutions and the tubings used to administer them to the Federal Bureau of Investigation for analysis. Analysis revealed that the norepinephrine solution prepared by the defendant contained no trace of the medication. Analysis also revealed a discrepancy concerning the epinephrine solution prepared by the defendant. Although the defendant had written on the label that the epinephrine solution contained the prescribed amount of the drug, the FBI analysis revealed that the solution only contained one-tenth of the amount of the drug indicated on the label. The Chief Medical Examiner testified that the immediate cause of Peggy Epley's death was the removal of such pharmacological support and the resulting drop in her blood pressure.

On 26 August 1987, State Bureau of Investigation agents David Barnes and J. T. Readling contacted the defendant in Charlotte, North Carolina at the Emergency Medical Services Substation. During the interview, the defendant discussed his care for Peggy Epley on the morning that she died. In response to the defendant's statements, agent Barnes stated that he believed that the defendant intentionally withheld Epley's blood pressure medication by

mixing the solutions without the prescribed drugs. At one point during the interview, the defendant agreed with the agent's theory and stated that his decision to use the improperly mixed medication had been "spontaneous." He further stated that he had wanted Epley to finish dying. Thereafter, the defendant ended the interview.

At trial, the defendant testified on his own behalf. He testified that he had done everything within his power to care for Epley, despite the fact that her grim condition had discouraged him. He denied ever mixing Epley's blood pressure medications improperly. Even though the labels on the solution bottles bore his signature, he testified that some unknown person had mixed the solutions.

Dr. Kenneth Brassfield, a doctor of pharmacology, testified that norepinephrine and epinephrine break down rather quickly after being mixed in a solution. He further testified that subsequent tests run on the solutions would indicate a lower amount of the medication than originally mixed and that there is a lack of scientific data concerning the reliability of the tests. Therefore, Dr. Brassfield did not trust the FBI's analysis of the blood pressure solutions used on Epley.

Additional evidence and other matters relevant to the defendant's specific assignments of error are discussed at other points in this opinion.

By an assignment of error, the defendant contends that the trial court committed reversible error by admitting evidence of incriminating statements he made to two SBI agents. At trial, SBI agent David Barnes testified as follows:

At that time Mr. Shook said that he drew blood gases throughout the morning to determine what Mrs. Epley's oxygen content was; and that while he was gone to the lab to get these results, he had asked either the charge nurse or some other nurse to watch Mrs. Epley while he went.

. . .

And [he] stated that he had asked someone to mix the new drips but could not recall who he had asked. And further stated that he was busy getting the crash cart ready and that when the unknown person or person he couldn't recall had mixed the drips and handed them to him already mixed

**STATE v. SHOOK**

[327 N.C. 74 (1990)]

that he then put labels on the bottles and hung those bottles that he signed.

. . .

At this point in the interview I stopped him and told him that the evidence that I had in my possession and the interviews that I had conducted along with the other investigators showed me that what he was telling me was not true. And I then stated to him the theory . . . that Mr. Shook did, in fact, mix these drips and — but without the prescribed medications in them; and the reason that this was done, in the opinion of the investigators based on the investigation, was to allow Mrs. Epley to pass away or to die.

Mr. Shook at that time dropped his head much like this, looked in a downward fashion. He was sitting on a counter in the kitchen at the time and stated, "what's going to happen to me if I say yes?"

I told him that I would make the people who had a need to know this information aware of it. And . . . Mr. Shook stated that he helped her out. Mr. Shook stated that he knew how hard it is to let go of a loved one and that Mr. Epley did not want to let Mrs. Epley go. Mr. Shook further stated that he has always in the past been able to foresee a patient's needs and had never done anything like this before. Mr. Shook stated that he did not put any epinephrine in the drip, but thought he had asked someone to mix the [norepinephrine] and thought the [norepinephrine] was in the drip.

I stopped him again and stated that he had just told me that he helped Mrs. Epley pass away and that it would make no sense then to maintain that he placed life-sustaining fluid in that [norepinephrine] drip. And he — agreed with that. Mr. Shook stated it had become difficult for him to go into Mrs. Epley's room each day and that he felt that Mrs. Epley would expire or pass away within the next several days. And he said that he, quote, I — he said, I quote, "I just wanted her to finish dying." Mr. Shook stated that it was a spontaneous decision to hang the improperly mixed drips. He said that he was aware of what would happen if the epinephrine drip contained no epinephrine, that Mrs. Epley would die or pass away. Then he stated that he wanted to see how she would do without

the epinephrine and that he had her down to almost no epinephrine . . . that morning.

I asked Mr. Shook if he knew of any crime that had been committed. He stated he wasn't sure any crime had been committed.

The defendant argues that the trial court improperly admitted evidence of his confession because there was no independent evidence that a criminal act had been committed. We disagree.

[1, 2]  In noncapital cases, such as this, where the State relies upon a confession to obtain a conviction, it is not necessary "that there be independent proof tending to establish the *corpus delicti* of the crime charged if the accused's confession is supported by substantial independent evidence tending to establish its trustworthiness, including facts that tend to show the defendant had the opportunity to commit the crime." *State v. Parker*, 315 N.C. 222, 236, 337 S.E.2d 487, 495 (1985). In this case, the State introduced substantial independent evidence tending to establish the trustworthiness of the defendant's confession. Although the victim was extremely ill, the evidence tended to show that she remained in a relatively stable condition with her blood pressure at a reasonable level if she received intravenous infusions of the prescribed doses of norepinephrine or epinephrine. At the time of the victim's death, the solution she was receiving intravenously contained no norepinephrine. When the victim did not respond to the solution labeled as containing norepinephrine, she was switched to a different solution labeled as containing epinephrine. However, that solution was not effective since it only contained one-tenth of the prescribed amount of epinephrine indicated on the label. Each solution had been prepared and labeled by the defendant. This evidence closely parallels the defendant's confession and tends to establish its trustworthiness.

Further, the uncontroverted cause of the victim's death was the removal of pharmacological support and resulting drop in her blood pressure. This too tends to corroborate those parts of the defendant's confession in which he stated that he improperly mixed the victim's medication and negates the possibility that the defendant confessed to a crime which had not been committed. We conclude that the defendant's confession was supported by sufficient independent evidence of its trustworthiness to be admissible. This assignment of error is without merit.

STATE v. SHOOK

[327 N.C. 74 (1990)]

[3] By another assignment of error, the defendant contends that the trial court committed reversible error in failing to instruct the jury on the lesser included offense of involuntary manslaughter. The trial court submitted two possible verdicts for the jury to consider: guilty of first-degree murder and not guilty. The defendant argues that the evidence also required an instruction on and submission of a possible verdict finding him guilty of involuntary manslaughter. We disagree.

While involuntary manslaughter is a lesser included offense of first-degree murder, the trial court was not required to submit a verdict on that lesser included offense unless it was supported by evidence. *See State v. Strickland*, 307 N.C. 274, 298 S.E.2d 645 (1983). If, however, there was any evidence introduced tending to support the lesser included offense of involuntary manslaughter, then it was the trial court's duty to submit a possible verdict for that offense after appropriate instructions. *Id.* Upon a review of the record, we conclude that the evidence presented at trial would not have supported a verdict finding the defendant guilty of involuntary manslaughter. Therefore, the trial court did not err by failing to submit a possible verdict on that offense to the jury.

The evidence tended to show that the victim died as a result of having her life-sustaining medications withheld. The defendant argues that the evidence at trial would have supported a reasonable finding by the jury that he negligently mixed the victim's medication solutions improperly. At trial, however, the defendant simply testified to the effect that he had not prepared the victim's medication or done anything else wrong, either intentionally or unintentionally. In his pre-trial statement to the SBI agents, on the other hand, he indicated that he knowingly withheld the victim's medication with the intent to cause her death, but that he did so "spontaneously." We find no evidence in the record or transcript sufficient to support a reasonable finding by the jury that the defendant negligently and unintentionally withheld the medication from the victim. Therefore, the evidence would not have supported a verdict finding the defendant guilty of involuntary manslaughter, and the trial court did not err in failing to submit such a possible verdict to the jury. This assignment of error is without merit.

[4] By another assignment of error, the defendant argues that the trial court improperly overruled his objection to highly prejudicial opinion testimony. During the State's direct examination of

STATE v. SHOOK

[327 N.C. 74 (1990)]

Gerald Epley, the victim's husband, the following exchange took place:

Q. Did there come a time when she was moved back to intensive care that you had occasion to become acquainted with the defendant?

A. Yes.

Q. And will you point out the defendant to us, please?

A. Right there in the middle.

Q. Mr. Shook?

A. Right.

Q. And how did you come in contact with Mr. Shook?

A. I went up one night to see how my wife was doing.

Q. And what happened?

A. Well, she wasn't doing to [sic] good. He said she — her blood pressure was going — had been going down.

Q. Now, this is the defendant that's talking directly to you; is that right?

A. Right.

Q. All right. Go ahead and tell us what he said.

A. Well, I was really concerned about my wife. I was there mostly just to check in on her. He was trying to impress it was a severe condition and had I talked to the doctor about it.

Q. All right.

A. And he kept impressing on me how bad a condition it was. And I did ask him could a condition like that be cleared up. As far as I know, he never answered me on that. And he did pull out doctor — the doctor's notes and —

Q. The chart itself?

A. Right.

Q. All right. And what did he — what did he do with it?

A. And he said, "In Dr. Hamilton's notes here he says the situation is grim."

Q. Grim?

A. Right.

Q. And then what happened after that? What did you say to him?

A. Well, I just told him I hadn't give up on her, she was a good mother, a good wife, she never did complain and she wanted to get better.

Q. Did you indicate to him in any way that you would hope your wife would die or anything like that?

A. No, in no way, shape or form.

Q. You gave him no indication that you wanted them to withhold any life support system?

A. No, indeed not.

Q. Did you even have any discussion about that?

A. No, indeed not.

Q. He didn't even suggest that to you, did he?

A. No, he didn't suggest it, huh-uh. It seemed—well—

Q. Go ahead.

A. It seemed like his attitude toward me was like he was wanting me to give up on her.

[Objection by defense counsel overruled.]

The defendant, citing *State v. Sanders*, 295 N.C. 361, 245 S.E.2d 674 (1978), *cert. denied*, 454 U.S. 973, 70 L. Ed. 2d 392 (1981), contends that Gerald Epley's testimony constituted inadmissible evidence of his opinion as to another person's intention on a particular occasion. We disagree.

Epley's testimony satisfied the requirements of N.C.G.S. § 8C-1, Rule 701 in that it was both rationally based on his perception and helpful to the jury. The questioned testimony went not to the defendant's intent, but simply related the witness' perception as to the defendant's state of mind and the effect it had on the

witness. Such testimony was helpful in explaining the witness' testimony concerning why he subsequently asked the hospital not to assign the defendant to care for his wife. We conclude, therefore, that the testimony was properly admitted under Rule 701. *State v. McElroy*, 326 N.C. 752, 392 S.E.2d 67 (1990).

The defendant received a fair trial free of prejudicial error.

No error.

Justice WEBB concurring.

I concur in the result reached by the majority. I write this concurring opinion because I do not believe we have properly treated the issue of proof necessary to make a confession admissible. I believe this Court went off the track in *State v. Brown*, 308 N.C. 181, 301 S.E.2d 89 (1983), in holding that a confession should not be admitted unless the State offers proof aliunde the confession that the crime was committed. It is time to return to the rule which was in effect before *Brown*.

I believe that prior to *Brown* the rule for making confessions admissible was well established in the following cases: *State v. Green*, 295 N.C. 244, 244 S.E.2d 369 (1978); *State v. Thompson*, 287 N.C. 303, 214 S.E.2d 742, *death sentence vacated*, 428 U.S. 908, 49 L.Ed.2d 1213 (1976); *State v. Jenerett*, 281 N.C. 81, 187 S.E.2d 735 (1972); *State v. Whittemore*, 255 N.C. 583, 122 S.E.2d 396 (1961), and *State v. Macon*, 6 N.C. App. 245, 170 S.E.2d 144 (1969), *aff'd*, 276 N.C. 466, 173 S.E.2d 286 (1970). In *Thompson*, Chief Justice Branch stated the rule as follows:

> Defendant correctly contends that his conviction cannot be sustained upon a naked extrajudicial confession. However, it is equally well settled that if the State offers into evidence sufficient extrinsic corroborative circumstances as will, when taken in connection with an accused's confession, show that the crime was committed and that the accused was the perpetrator, the case should be submitted to the jury.

*State v. Thompson*, 287 N.C. at 324, 214 S.E.2d at 755. The defendant in *Thompson* had been convicted of murder. The evidence which Chief Justice Branch held corroborated the defendant's confession was that the defendant was found in an automobile similar to the one belonging to the deceased, the defendant had a large sum

STATE v. SHOOK

[327 N.C. 74 (1990)]

of money, the defendant had an opportunity to steal the pistol which was shown to have fired the fatal bullets, the defendant had in his possession a pistol which was the same color as the one which fired the bullets into the deceased's body, and his girlfriend saw some empty shells in the possession of the defendant. This was not evidence aliunde the confession sufficient to prove the murder had been committed.

In *Whittemore*, the defendant was tried for a crime against nature and carnal knowledge of a virtuous girl. A penetration is necessary for a person to be convicted of either crime. The State's witness did not testify that there was a penetration so that there was not proof that a crime had been committed. We said this was not enough to convict the defendant of either crime. The defendant confessed, however, and we held that the testimony of the State's witness and the confession was enough to sustain the conviction. Justice Rodman, writing for the Court, said:

"A conviction cannot be had on the extrajudicial confession of the defendant, unless corroborated by proof *aliunde* of the *corpus delicti*. Full, direct, and positive evidence, however, of the *corpus delicti* is not indispensable. A confession will be sufficient if there be such extrinsic corroborative circumstances, as will, *when taken in connection with the confession*, establish the prisoner's guilt in the minds of the jury beyond a reasonable doubt."

*State v. Whittemore*, 255 N.C. at 589, 122 S.E.2d at 401 (quoting *Masse v. United States*, 210 F.2d 418, 420 (5th Cir. 1954)).

Justice Dan Moore in *Jenerett* quoted *Whittemore* with approval. In *Macon*, the defendant was convicted of second degree murder. The State's evidence showed that the skeleton of the victim was found with a bullet hole through her skull. This evidence was held to be sufficient proof of the corpus delicti to make the defendant's confession admissible. We affirmed this holding. The fact that there was a bullet hole through the victim's skull did not prove she was murdered. It could have just as easily been inferred that it was an accident or that it was a suicide. I believe *Macon* contains a square holding that it is not necessary to prove a crime has been committed in order to make a confession admissible. In that case Judge Parker, writing for the Court of Appeals said:

To establish a *prima facie* showing of the *corpus delicti* the prosecution need not eliminate all inferences tending to show a non-criminal cause of death. "Rather, a foundation (for the introduction of a confession) may be laid by the introduction of evidence which creates a reasonable inference that the death could have been caused by a criminal agency . . . even in the presence of an equally plausible non-criminal explanation of the event (citing cases)."

*State v. Macon,* 6 N.C. App. at 253, 170 S.E.2d at 149.

I have discussed these cases at some length in order to show that prior to *Brown* we had a simple and good rule on the admissibility of confessions. That rule was that if there was evidence independent of the confession which, taken with the confession showed a crime had been committed and that the defendant did it, the confession should be admitted. There was no reason to change this rule as was done in *Brown.* Confessions can be good evidence and should not be restricted by an arbitrary rule.

Following *Brown* the problems caused by that case began to surface. In *State v. Franklin,* 308 N.C. 682, 304 S.E.2d 579 (1983), no problem arose because the commission of the crime could be proved independently of the confession. In *State v. Parker,* 315 N.C. 222, 337 S.E.2d 487 (1985), we changed the rule in non-capital cases and said, "it is no longer necessary that there be independent proof tending to establish the *corpus delicti* of the crime charged if the accused's confession is supported by substantial independent evidence tending to establish its trustworthiness, including facts that tend to show the defendant had the opportunity to commit the crime." *Id.* at 236, 337 S.E.2d at 495. I believe this is a very difficult test to apply.

In *State v. Trexler,* 316 N.C. 528, 342 S.E.2d 878 (1986), the defendant was convicted of driving while impaired. The evidence was that a Mr. Hall was awakened at 2:30 a.m. by a loud noise outside his home. He looked out his window and saw an automobile lying upside down in the road. He also saw someone leaving the vehicle. A highway patrolman came to the scene and the defendant told him he had been driving the automobile. The chemical analysis revealed that defendant's blood alcohol content was .14. The Court of Appeals held that *Brown* required the case to be dismissed because there was not evidence aliunde the confession that there had been a crime committed.

STATE v. SHOOK

[327 N.C. 74 (1990)]

We reversed the Court of Appeals in *Trexler*. In doing so I believe we demonstrated how difficult it is to apply the rule as now stated. At one point we said:

It is well established in this jurisdiction that a naked, uncorroborated, extrajudicial confession is not sufficient to support a criminal conviction. Our application of the *corpus delicti* rule before our decision in *State v. Parker*, 315 N.C. 222, 337 S.E.2d 487 (1985), required that there be corroborative evidence, independent of defendant's confession, which tended to prove the commission of the charged crime.

*State v. Trexler*, 316 N.C. at 531, 342 S.E.2d at 880.

Later in the opinion in *Trexler* we said that the pre-*Parker* rule has not been abandoned but that *Parker* expanded the type of corroboration which may be sufficient. We said:

The pre-*Parker* rule is still fully applicable in cases in which there is some *evidence aliunde* the confession which, when considered with the confession, will tend to support a finding that the crime charged occurred. The rule does not require that the *evidence aliunde* the confession prove any element of the crime. The *corpus delicti* rule only requires *evidence aliunde* the confession which, when considered with the confession, supports the confession and permits a reasonable inference that the crime occurred. 30 Am. Jur. 2d *Evidence* § 1142 (1967). The independent evidence must touch or be concerned with the *corpus delicti*. *State v. Parker*, 315 N.C. 222, 337 S.E.2d 487.

*State v. Trexler*, 316 N.C. at 532, 342 S.E.2d at 880-81. If this be the test we have returned to the rule of *Thompson* with the added requirement of *Parker* that the independent evidence be concerned with the corpus delicti. We apparently used this revised *Thompson* test in *Trexler* when we said, "[w]e need not rely upon the *Parker* rule for here there is *evidence aliunde* defendant's confession touching on the *corpus delicti* which when considered with other evidence tends to support a finding that the charged crime occurred." *State v. Trexler*, 316 N.C. at 533, 342 S.E.2d at 881. Although we used the pre-*Brown* test in *Trexler*, we said we were using the *Brown* test.

In *State v. Johnson*, 317 N.C. 343, 346 S.E.2d 596 (1986), we again faced the question of the sufficiency of corroborating evidence to support a confession. The defendant was convicted of first degree

STATE v. SHOOK

[327 N.C. 74 (1990)]

murder, kidnapping and rape. In that case the victim's body was found on a road several miles from her automobile. There were fifty-five separate stab wounds in the body. A forensic odontologist testified that the defendant's teeth matched bite marks on the victim's breast. There was sperm in the victim's vagina. The defendant contended on appeal that his confession to kidnapping and rape did not support a conviction as to either crime because there was not proof of a corpus delicti in either case. We recognized *Brown* as being the controlling authority, but then said, "[t]he pre-*Parker* rule is still fully applicable in cases in which there is some *evidence aliunde* the confession which, when considered with the confession, will tend to support a finding that the crime charged occurred." *State v. Johnson*, 317 N.C. at 373, 346 S.E.2d at 612 (quoting *State v. Trexler*, 316 N.C. 528, 532, 342 S.E.2d 878, 880 (1986)). As we have seen, this is the *Thompson* rule and not the *Brown* rule.

The evidence in *Johnson* which we said established the corpus delicti for the kidnapping charge was that the victim's body was found miles from her home and her car, that bloodstains were found on the defendant's car and clothing and bruises were found on her face. The evidence which we said established the corpus delicti for the rape charge was the stab wounds, a bruise on the victim's face and bite marks on her left breast and thigh, bloodstain patterns in the defendant's car, the victim's torn clothes which left her body exposed from her neck to her ankles and semen in her vagina. If the *Thompson* test is used this evidence should be sufficient to establish the corpus delicti for both charges. If the *Brown* test is used it is more difficult and I do not believe it can be done on the kidnapping charge.

I have discussed the cases at some length because I believe they demonstrate that *Brown* has given us a rule which is confusing and difficult to apply. Some of our cases treat confessions as if they should be suspect evidence and subject to artificial rules before admission. I believe the opposite is true. Unless the evidence shows a confession is coerced I do not see how we could have better evidence. I would have a simple rule, such as the one stated in *Thompson*.

It is for these reasons that I concur in the result.