STATE OF NORTH CAROLINA v. EDWARD GRADY MACON, JR.

No. 35

(Filed 15 April 1970)

1. **Constitutional Law § 30; Criminal Law §§ 101, 130— right to impartial jury — deputy sheriffs as witnesses and court officers**
   In this homicide prosecution, defendant's constitutional right to a fair trial by an impartial jury, as guaranteed by the Sixth and Fourteenth Amendments, was not violated when two deputy sheriffs who were wit-

nesses for the State and testified against defendant were allowed to act as court officers or bailiffs during the trial, where the jury was not sequestered, the deputies were not in the presence of the jurors outside the courtroom, had no communication at any time with them, had no custodial authority over them, and the only service of the bailiffs to the jurors was in opening the door to send them out or call them in, defendant having failed to show circumstances affording any reasonable ground upon which to attack the fairness of the trial or the integrity of the verdict.

**2. Criminal Law §§ 101, 130— State's witness — disqualification to act as custodian or officer in charge of jury**

A State's witness is disqualified to act as "custodian" or "officer in charge" of the jury in a criminal case.

**3. Criminal Law § 42; Constitutional Law § 31— pretrial examination of State's exhibits — G.S. 15-155.4**

An accused is entitled to the benefits of G.S. 15-155.4, relating to a court order for pretrial examination of State exhibits, when either he or his counsel (1) has made written request to the State's counsel that the State produce for defendant's inspection, examination, copying and testing sufficiently in advance of the trial to permit him to prepare his defense (2) a specifically identified exhibit to be used in the trial of the case, and (3) said request has been denied or gone unanswered for more than 15 days.

**4. Criminal Law § 80; Constitutional Law § 31— denial of pretrial examination of SBI agent's interrogation notes**

In this homicide prosecution, the court did not err in the denial of defendant's motion under G.S. 15-155.4 that the State's counsel be required to permit defense counsel to examine the typewritten transcript of notes made by an SBI agent during interrogation of defendant, where no written request was made to the State's counsel and no refusal or neglect was shown as required by the statute, and the notes were not an exhibit to be used at the trial, no prejudice having resulted to defendant in any event since defense counsel examined the notes at the trial and cross-examined the SBI agent at great length concerning them.

LAKE, J., did not participate in the consideration or decision of this case.

APPEAL by defendant to review decision of the Court of Appeals upholding judgment of *McKinnon, J.,* 1 July 1968 Session, WAKE Superior Court. The appeal was docketed in the Supreme Court as Case No. 59 and argued at the Fall Term 1969. Thereafter, we allowed certiorari with respect to other than constitutional questions, and the case was reargued at the Spring Term 1970.

Defendant was tried on a bill of indictment charging him with the murder of Jane Ellen Smith on 31 July 1967. The solicitor sought a verdict of guilty of murder in the second degree or manslaughter as the evidence might disclose.

The State's evidence tended to show that Jane Ellen Smith was a married woman living with her husband at Route 3, Apex, North Carolina. On Monday, 31 July 1967, she left home around 7:15 p.m. in her husband's 1956 Ford, ostensibly going to the drug store. She was wearing a blouse, shorts and leather-strap sandals. She had a high school class ring with her initials in the band on her finger and a Miss America Bulova wristwatch on her arm. When she failed to return home that night, her husband and sister informed a deputy sheriff at Apex that she was missing and furnished a description of what she was wearing when she left home.

On 10 March 1968 a skeleton was found near the Oscar Jones Pond one mile east of N. C. Highway 55, two miles north of Holly Springs, and approximately five miles southwest of Apex. The bones of the skeleton appeared to have been gnawed upon, were widely scattered, and some were missing altogether. The skull, the larger bones, and many of the smaller bones were recovered. The undergarments, the blouse, the shorts, the sandals, the ring, and the wristwatch — all of which were worn by Jane Ellen Smith when she left home on the evening of 31 July 1967 — were found at the site of the skeleton.

In the opinion of an expert pathologist, the skull was that of an adult female human being. The skull had a hole on both the left and the right side. The hole on the left was smaller. The hole on the right had the appearance of having been blown outward by a force moving from left to right and exiting on the right side. This type of perforation was compatible with that caused by a bullet. Injury to the brain by such perforation would likely cause death. Small metallic fragments removed from inside the skull were, on analysis, found to be lead and copper.

Defendant had known Jane Ellen Smith prior to 31 July 1967. He had been seen driving along the highway in front of her house and looking toward it. He had been observed on two occasions when he stopped in front of her house to pick her up. Her fourteen-year-old daughter had accompanied her on several occasions when she drove to meet defendant elsewhere — twice when they met in the woods on the road leading from Highway 55 to the Oscar Jones Pond. During the late afternoon of 31 July 1967, defendant was seen passing Jane Ellen Smith's house and looking toward it.

Prior to 7 October 1967 defendant owned a .38 caliber Charter Arms pistol, serial number 5744, which he swapped on that date for a .38 caliber Smith and Wesson, Model 10.

The State's evidence further tended to show that on 16 March 1968 defendant told Robert D. Emerson, Special Agent of the State Bureau of Investigation, that he formerly resided in Apex and during the summer of 1967 was associating with Jane Ellen Smith and had sexual relations with her on at least one occasion; that he met her one night during the summer of 1967 on Highway 64 near Apex; that she parked her car, got into his 1955 Chevrolet, and he drove down Highway 55 south of Apex and parked off the highway; that they drank some beer and got into an argument but no blows were passed; that he shot Jane Ellen Smith with a .38 caliber revolver and left the body in a wooded area off Highway 55, leaving her personal effects with the body; that he drove to Fuquay and then returned to Wake Forest where he was staying; that he did not see why he had to suffer for the death of Jane Ellen Smith; that she was a slut and led him on and that she was not worth a tinker's damn; that to the best of his knowledge the .38 caliber Charter Arms pistol, serial number 5744, was the weapon he used to shoot Jane Ellen Smith.

The defendant offered evidence which tended to show that he is forty-nine years of age, married, and has four children. He lived in Apex and was employed by the Durham and Southern Railroad until 15 November 1966. He first met Jane Ellen Smith when he talked with her about the crossing over the Durham and Southern tracks between her house and the paved road. Thereafter, he went with her three times — the last time on 24 July 1967 when she flagged him down at the intersection of Highways 1 and 64 south of Raleigh. He took her to get some beer and then drove down Highway 55 south of Apex to a spot opposite the Gas Pipeline Terminal where they parked and drank the beer. Then they continued on down Highway 55 to Fuquay-Varina. On arrival there she wanted more beer which he refused to provide. She got out of the car to walk on into town and he continued on down Highway 55. He had not seen Jane Ellen Smith since that time.

On 30 and 31 July 1967 (Sunday and Monday) defendant was staying in Wake Forest with his sister, mother, and grandmother. He was working for the Seaboard Railway out of Henderson. When he got off work at 4 p.m. on 31 July 1967 he went straight to Wake Forest, rested awhile, ate supper, watched television, and went to bed for the night. He was not in the vicinity of Apex or Holly Springs on that date and had never told anyone differently. He did not tell the officers that he shot Jane Ellen Smith. He bore her no ill will and had no desire to have her out of the way.

The jury convicted defendant of murder in the second degree, and a prison sentence of twenty to thirty years was imposed by the court. Defendant appealed to the Court of Appeals where his conviction was upheld, 6 N.C. App. 245, 170 S.E. 2d 144. Defendant appealed as of right on the constitutional question noted in the opinion, and we thereafter allowed certiorari.

*Hatch, Little, Bunn, Jones & Liggett by E. Richard Jones, Jr., and William P. Few, Attorneys for defendant appellant.*

*Robert Morgan, Attorney General, by Millard R. Rich, Jr., Assistant Attorney General, for the State.*

HUSKINS, J.

**[1]** The only constitutional question preserved and presented here for review is whether or not the trial court erred in allowing Deputy Sheriff Connie Holmes and Deputy Sheriff W. L. Pritchett, over objection, to act as court officers or bailiffs during the trial of this case in spite of the fact that both officers were witnesses and testified against the defendant. Defendant contends this amounted to a denial of Due Process under the Fourteenth Amendment and was a violation of his Sixth Amendment right to be tried "by an impartial jury of the state and district wherein the crime shall have been committed." We first examine decisions of this Court on the question presented.

In *State v. Hart*, 226 N.C. 200, 37 S.E. 2d 487 (1946), a deputy sheriff who was sworn and served as "officer of the jury" was also a witness for the State in the trial of the case. The extent of his exposure to the jury is not revealed by the record. Held: "The decisions by the various courts have not been in accord, but we are now of the opinion that the weight of authority is to the effect that an officer is not necessarily disqualified from acting as custodian of a jury in a criminal case because he happens to be a witness in the case. It is our opinion, and we so hold, that actual prejudice must be shown before the result of the trial can be, as a matter of right, disturbed. . . . [T]he findings of the trial judge upon the evidence and facts are conclusive and not reviewable."

In *State v. Taylor*, 226 N.C. 286, 37 S.E. 2d 901, an automobile which was then parked behind the courthouse was an exhibit material to the State's case. During the trial the car was offered in evidence, and the jury was permitted to retire to the courtyard in the custody of a deputy sheriff to view the vehicle. The deputy designated to conduct the jury to the courthouse lawn was a witness for the

State. There was no suggestion of any misconduct on the part of the jury or the officer, but defendant insisted that the occurrence was highly prejudicial to him. Held: "The practice of putting the jury in the custody of an officer who has actively investigated the evidence or has become a witness for the State is not to be approved. While, in the absence of evidence of some fact or circumstance tending to show misconduct on the part of the officer or the jury, we hesitate to make it alone the grounds for a new trial, we do stress' the need for trial judges to be extremely careful to avoid such incidents. . . . [T]hese occurrences always, as here, tend to bring the trial into disrepute and produce suspicion and criticism to which good men should not be subjected."

In *State v. Sneeden,* 274 N.C. 498, 164 S.E. 2d 190, defendant's motion for a mistrial and for a new trial was based upon a conversation between the bailiff and the jury foreman. During jury deliberations the bailiff opened the door to the jury room in response to a knock on the door and the following conversation, as related by the bailiff, took place: "The foreman asked me if he could ask me a question. I told him I could not answer a question. He says 'We wanted to know how quick a parole was possible.' I says 'It has nothing to do with the evidence.' And I reported it to the judge." Nothing else was said. While disapproving the conduct of the bailiff in assuming the role of the judge, the Court said: "The great weight of authority sustains the rule that '. . . a verdict will not be disturbed because of a conversation between a juror and a stranger when it does not appear that such conversation was prompted by a party, or that any injustice was done to the person complaining, and he is not shown to have been prejudiced thereby, and this is true of applications for a new trial by the accused in a criminal case as well as of applications made in civil actions. . . . [A]nd if a trial is really fair and proper, it should not be set aside because of mere suspicion or appearance of irregularity which is shown to have done no actual injury. . . . The matter is one resting largely within the discretion of the trial judge.' 39 Am. Jur., New Trial, § 101." See *Stone v. Baking Co.,* 257 N.C. 103, 125 S.E. 2d 363, where this statement of the rule is quoted with approval. See also Annotation: Prejudicial Effect, in Criminal Case, of Communication Between Court Officials or Attendants and Jurors, 41 A.L.R. 2d 227.

Conceding that prior holdings of this Court do not support his position, defendant contends that *Turner v. Louisiana,* 379 U.S. 466, 13 L. ed 2d 424, 85 S. Ct. 546 (1965), has invalidated those decisions and obviated the necessity for a showing of prejudice. Defendant argues that prejudice is inherent where a State's witness is placed

in charge of the jury and, in a constitutional sense, amounts to a denial of due process.

In the *Turner* case defendant was charged with murder in the perpetration of a robbery. Members of the jury were sequestered in accordance with Louisiana law and "placed in charge of the sheriff." The jurors "were continuously in the company of deputy sheriffs ... during the three days that the trial lasted. The deputies drove the jurors to a restaurant for each meal, and to their lodgings each night. The deputies ate with them, conversed with them, and did errands for them." Two of these deputies were the State's principal witnesses. One described in detail an investigation he had made at the scene of the murder. He further testified that the two of them later took Turner into custody, and that Turner led them to a place in the woods where a cartridge clip from the murder weapon was recovered. The second deputy corroborated this testimony and told of certain damaging admissions made by Turner at the time of his apprehension. This witness further described the circumstances under which Turner made a written confession — later offered in evidence.

Defendant moved for a mistrial when the deputies testified and for a new trial after the jury returned a guilty verdict. The motions were denied and Turner was sentenced to death. The Supreme Court of Louisiana affirmed on the ground that there was no showing of prejudice. 244 La. 447, 152 So. 2d 555. On certiorari, the Supreme Court of the United States reversed. It was held: (1) The constitutional right to jury trial guarantees a fair trial by an impartial jury, and failure to accord an accused a fair hearing violates even the minimal standards of due process (*In Re Oliver*, 333 U.S. 257, 92 L. ed 682, 68 S. Ct. 499; *Tumey v. Ohio,* 273 U.S. 510, 71 L. ed 749, 47 S. Ct. 437) ; (2) a verdict must be based upon the evidence developed at the trial, and the evidence must come from the witness stand "where there is full judicial protection of the defendant's right of confrontation, of cross examination, and of counsel"; (3) even assuming the deputies never discussed the case directly with any member of the jury, "it would be blinking reality not to recognize the extreme prejudice inherent in this continual association throughout the trial between the jurors and these two key witnesses for the prosecution"; and (4) this kind of association between jurors and key prosecution witnesses undermines the basic guarantees of trial by jury; moreover, the prejudice is potentially greater when the witnesses are officers "in charge of the jury" because such association fosters the confidence of jurors in witnesses who are also their *official guardians* during the trial.

We are in full accord with the sound principles of constitutional law enunciated in the *Turner* case. The facts in the case before us, however, do not invoke their application. In *Turner* the jury was sequestered — not so here. There, the deputies involved were "in actual charge of the jury." Here, they were only court officers or bailiffs. There, the deputies were in continuous and intimate association with the jurors, eating with them, conversing with them, and doing errands for them throughout a three-day trial. Here, the deputies were not in the presence of the jurors outside the courtroom, had no communication at any time with them, and had no custodial authority over them. The exposure of the jury to these bailiffs was brief, incidental, and without legal significance. Hence, defendant not only fails to show *actual prejudice* — he fails to show circumstances affording any reasonable ground upon which to attack the fairness of the trial or the integrity of the verdict. The only service of the bailiffs to the jurors was in "opening the door to send them out or call them in as occasion required." We hold on the facts in this record that defendant received a fair trial in a fair tribunal in keeping with basic requirements of Due Process. There is nothing to support the contention that his constitutional rights under the Sixth and Fourteenth Amendments have been violated.

[2]    Since the State's witnesses here had no custodial authority over the jury, *Turner* does not apply. Even so, trial judges should not overlook the significance of that decision. Simply stated, it holds that a State's witness is disqualified to act as *custodian* or *officer in charge* of the jury in a criminal case. We said as much in *State v. Taylor, supra.* Under such circumstances prejudice is conclusively presumed.

[4]    Appellant's next assignment worthy of note is based on denial of his written motion, filed 25 June 1968, that the "prosecuting officials" be required to permit defense counsel to inspect and examine the "typewritten transcript of notes made by SBI Agent Emerson during the interrogation of defendant on March 16, 1968."

The motion is grounded upon G.S. 15-155.4, relating to pretrial examination of witnesses and exhibits of the State, which provides in pertinent part as follows:

"In all criminal cases before the superior court, the superior court judge . . . shall for good cause shown, direct the solicitor or other counsel for the State to produce for inspection, examination, copying and testing by the accused or his counsel any specifically identified exhibits to be used in the trial of the case sufficiently in advance of the trial to permit the accused

> to prepare his defense. . . . Prior to issuance of any order for the inspecting, examining, copying or testing of any exhibit . . . under this section the accused or his counsel shall have made a written request to the solicitor or other counsel for the State for such inspection, examination, copying or testing of one or more specifically identified exhibits . . . and have had such request denied by the solicitor or other counsel for the State or have had such request remain unanswered for a period of more than 15 days."

[3]     Under this section, an accused is entitled to the benefits provided therein when either he or his counsel (1) has made written request to the State's counsel that the State produce for defendant's inspection, examination, copying and testing sufficiently in advance of the trial to permit him to prepare his defense (2) a specifically identified exhibit to be used in the trial of the case, and (3) said request has been denied or gone unanswered for more than fifteen days.

[4]     The statute contemplates request and denial (or neglect equivalent to denial) "prior to the issuance of any order" for such inspection. These requirements were not met. No written request was made to the State's counsel and no refusal or neglect to furnish is shown. Furthermore, the notes made by Agent Emerson during his interrogation of defendant were not an exhibit to be used at the trial. Finally, the record shows that defense counsel examined the notes at the trial and cross-examined Agent Emerson at great length concerning them. We hold that defendant's motion was properly denied and that, in all events, no prejudice resulted.

Defendant's other assignments of error have been carefully examined but merit no discussion. They are adequately treated in the opinion of Parker, J., for the Court of Appeals, and further discussion here would serve no useful purpose. In the final analysis, defendant's guilt or innocence was a question of fact for the jury. It accepted the State's version, and no error of law requiring a new trial has been made to appear. The decision of the Court of Appeals upholding the verdict and judgment is therefore

Affirmed.

LAKE, J., did not participate in the consideration or decision of this case.