451 S.E.2d 425

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Larry Gene KELLEY, Jr., Defendant Below, Appellant.**

No. 22205.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 20, 1994.

Decided Nov. 21, 1994.

Larry S. Whited, Grantsville, Kennad L. Skeen, Skeen & Skeen, Ripley, for appellant.

Darrell V. McGraw, Jr., Atty. Gen., Shawn A. Taylor, Asst. Atty. Gen., Charleston, for appellee.

McHUGH, Justice:

This case is before this Court upon an appeal from the July 16, 1993, order of the Circuit Court of Calhoun County, West Virginia. The appellant, Larry Gene Kelley, Jr., was found guilty of one count of second degree murder. The appellant was sentenced to confinement in the West Virginia Penitentiary for an indeterminate period of not less than five nor more than eighteen years. The appellant asks that this judgment be set aside and that he be granted a new trial. For the reasons stated below, the judgment of the circuit court is reversed and this case is remanded.

## I

In February, 1992, Christine Melrath and the appellant shared a mobile home in Calhoun County. Ms. Melrath had recently renewed a relationship with Joseph Duval. Mr. Duval then moved into the mobile home with Ms. Melrath and the appellant.

On February 25, 1992, Ms. Melrath and Mr. Duval met the appellant at a bar. After they each had a couple of beers, they returned to the mobile home they all shared. They continued to consume beer and liquor as they sat and talked at the kitchen table. Thereafter, the appellant shot Mr. Duval above his left eyebrow and then called the ambulance.

The appellant claims that Mr. Duval had threatened him and thereafter the appellant laid down on the couch. The appellant then claims that he was awakened only to see Mr. Duval approaching him in a menacing manner. It was then, according to the appellant, that he grabbed a .25 caliber pistol which he routinely carried and shot Mr. Duval.

The State claims that following the shooting Ms. Melrath questioned the appellant as to what happened and the appellant admitted to killing Mr. Duval. The police arrived at the scene and, as testified to by Sheriff William Stemple, the appellant identified himself and admitted to shooting Mr. Duval. Sheriff Stemple then advised the appellant of his rights. Upon the arrival of the police, the appellant spoke with a sharp tongue and acted very nonchalant and rather cavalier about the whole matter.

On February 29, 1992, Mr. Duval died due to injuries caused by the gunshot wound. On May 11, 1993, the trial began in this case, and on May 14, 1993, the jury found the appellant guilty of murder in the second degree. On July 16, 1993, the appellant was sentenced for an indeterminate period of not less than five nor more than eighteen years in jail. It is from this order that the appellant appeals to this Court.

## II

The appellant raises numerous assignments of error on appeal. However, we will only consider one assignment of error which raises an important constitutional question as to whether the trial court erred in allowing Sheriff Stemple to act as bailiff during the appellant's trial despite the fact that Sheriff Stemple was a witness who testified on behalf of the State. The other assignments are without merit or were inadequately briefed. *See State v. Flint*, 171 W.Va. 676, 679 n. 1, 301 S.E.2d 765, 768 n. 1 (1983); *Addair v. Bryant*, 168 W.Va. 306, 320, 284 S.E.2d 374, 385 (1981).

The appellant argues that he was prejudiced by the fact that Sheriff Stemple was allowed to serve as a bailiff and as a witness in the appellant's trial, thus leading to interaction with the jurors and other witnesses.

Apparently, the court was understaffed and Sheriff Stemple was the only available officer to serve as bailiff. Furthermore, all witnesses participating in the case were sequestered by the court except for Sheriff Stemple, Mike Ash, the investigator for the defense, and Trooper David Garrett, who later arrived at the crime scene and took charge of the investigation once the sheriff left the crime scene. The court noted that the situation regarding the sheriff acting as bailiff in this case was unfortunate, and upon the request of the appellant, instructed the bailiff to refrain from having any sort of contact or conversation with the jurors other than what was ordered by the court.

This Court must resolve the question as to whether the appellant's constitutional rights were violated when the sheriff was the bailiff at the appellant's trial and also testified as a witness on the State's behalf. The United States Supreme Court addressed this very issue in the case of *Turner v. Louisiana*, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965). In *Turner*, two deputy sheriffs served dual roles as key prosecution witnesses and as jury custodians in a trial in which the defendant therein was found guilty of murder and sentenced to death. The two deputies were the investigating officers in charge of the crime scene in question and the two men testified as to what their investigation revealed. The jury was sequestered in accordance with Louisiana law which meant that the deputies were in "close and continual association with the jurors[.]" *Id.* at 468, 85

S.Ct. at 547, 13 L.Ed.2d at 426. For instance, the two deputies drove the jurors to a restaurant for their meals and to the jurors place of lodging each night. The deputies ate with, talked to and ran errands for the jurors. One of the deputies even admitted to knowing most of the jurors and making new acquaintances with the jurors he did not know.

The Louisiana Supreme Court affirmed defendant Turner's conviction. However, the United States Supreme Court reversed and remanded the state appellate court's decision and held that the close and continual association between the prosecution's key witnesses and the jury deprived the defendant of the right to trial by an impartial jury as required by the Due Process Clause of the Fourteenth Amendment of the *United States Constitution*. In support of its holding, the Court reasoned that:

[E]ven if it could be assumed that the deputies never did discuss the case directly with any members of the jury, it would be blinking reality not to recognize the extreme prejudice inherent in this continual association throughout the trial between the jurors and these two key witnesses for the prosecution. We deal here not with a brief encounter, but with a continuous and intimate association throughout a three-day trial....

It would have undermined the basic guarantees of trial by jury to permit this kind of an association between the jurors and two key prosecution witnesses who were *not* deputy sheriffs. But the role that [the two deputies] played ... made the association even more prejudicial. For the relationship was one which could not but foster the jurors' confidence in those who were their official guardians during the entire period of the trial. And Turner's fate depended upon how much confidence the jury placed in these two witnesses.

*Id.* at 473–74, 85 S.Ct. at 550, 13 L.Ed.2d at 429–30 (footnote omitted).

In 1972, *Turner* was followed by *Gonzales v. Beto*, 405 U.S. 1052, 92 S.Ct. 1503, 31 L.Ed.2d 787 (1972). Again, the court was faced with a county sheriff who simultaneous-ly served as a bailiff and as a key witness for the prosecution in a murder trial. The sheriff, in his capacity as bailiff, ushered the jurors in and out of the courtroom, escorted the jurors to a restaurant for lunch, dined and conversed with the jurors, and accommodated their requests for soft drinks during deliberations.

The lower court denied the defendant/petitioner's habeas corpus application. The Supreme Court's order mandated that the case be reversed and remanded on the basis that the case fell within the four corners of *Turner*. In its recollection of *Turner*, the court was mindful of the fact that:

*Turner*, ..., did not set down a rigid, *per se* rule automatically requiring the reversal of any conviction whenever any Government witness comes into any contact with the jury. The Court's opinion specifically indicated that association with the jury by a witness whose testimony was 'confined to some uncontroverted or merely formal aspect of the case for the prosecution' would hardly present a constitutional problem.... And it indicated that a mere 'brief encounter,' by chance, with the jury would not generally contravene due process principles.... [C]ertain chance contacts between witnesses and jury members, ..., are often inevitable.

*Id.* 405 U.S. at 1054–55, 92 S.Ct. at 1504–05, 31 L.Ed.2d at 788–89 (citation omitted). Yet, the court emphasized that *Turner* dealt with a crucial witness who associated with the jurors as their official guardian, and the court repeated that *Turner* established the principle that such an association cannot be permitted if criminal defendants are to be afforded a fair trial.

Other jurisdictions have looked to *Turner* as an analytical cornerstone by which to resolve this issue or analogous situations as the following discussion reveals. The Supreme Court of Georgia grappled with this issue and ultimately reversed a defendant's conviction for murder, rape, kidnapping, aggravated sodomy and burglary. In *Radford v. State*, 263 Ga. 47, 426 S.E.2d 868 (1993), a deputy serving a dual role as the bailiff and as a prosecution witness testified to what he learned since he was the first law officer to

128

respond to the report of the crime and what later ensued as a result of what he had learned. The court's concentration, as guided by the principles set forth in *Turner*, was initially directed upon whether the deputy could be considered a key witness in the case and secondly whether the deputy's association with the jury could be described as a brief encounter. With respect to his testimony, the court found that even though some of the deputy's testimony was cumulative of and corroborated by other evidence, he could not be characterized as a " 'minor' " witness. *Id.* 426 S.E.2d at 869. Regarding the jury contact, the deputy told the court that he rode with the jury while transporting them to and from their motel and their meals, he dined with them, talked with them about things other than the case and guarded them; consequently, the court found the deputy had " 'substantial and continuing contact with and authority over' " the jurors. *Id.* 426 S.E.2d at 870 (citation omitted).

The case of *State v. Macon*, 276 N.C. 466, 173 S.E.2d 286 (1970) provided the Supreme Court of North Carolina with the opportunity to also address the issue under the direction of *Turner*. The court was in accord with *Turner* but declined to apply *Turner* to *Macon* because the facts did not fall within the realm of *Turner*. More specifically, the court found the following facts to be in direct opposition to the facts in *Turner*: the jury was not sequestered; the deputies (there were two) were not in " 'actual charge' " of the jury but simply officers of the court; the deputies were not in the presence of the jurors outside the courtroom and had no communication with or custodial authority over them. *Id.* 173 S.E.2d at 290. Rather, the court found that the jury's exposure to the bailiffs was "brief, incidental, and without

legal significance." *Id.* Ultimately, the court stated that not only had the defendant failed to show actual prejudice, but he further failed to establish any reasonable ground upon which to attack the integrity of the verdict and the fairness of the trial.

In Texas, in the case of *Strickland v. State*, 784 S.W.2d 549 (Tex.Ct.App.1990), the defendant was convicted of delivery of marihuana. At the trial, the lower court permitted the sheriff to act as the bailiff and testify as to the chain of custody of certain evidence. The sheriff was not, and, as the court noted pursuant to *Turner*, could not be considered a key witness because his testimony was not a significant factor in arriving at a conviction. The court concluded that the record was void of harm or prejudice and such conduct did not constitute grounds for reversal.[1]

In reaching this result in this case, we follow the constitutional law principles pronounced in *Turner*. Because we are in accord with *Turner* and because the appellant argues that his due process rights were jeopardized, we will conduct a comparative analysis between this case and *Turner*.

In *Turner*, the jury was sequestered, but not so here. Thus, the deputies therein were in charge of the jury during that period of sequestration. Here, Sheriff Stemple was simply a court officer or bailiff. There, the deputies were in close and continuous association with the jurors engaging in small talk while dining with, running errands for and transporting the jurors. Here, there is no evidence that the bailiff was in the presence of the jury outside the confines of the courtroom or that he had conversations with the jurors.

1. The California Court of Appeals was recently confronted with comparable circumstances in *Espinoza v. State*, 28 Cal.App.4th 957, 34 Cal. Rptr.2d 297 (1994). The court in *Espinoza*, however, was presented with a different set of facts. The petitioner sought to prohibit the county sheriff's department from supplying the bailiff in the petitioner's trial because deputies from that particular sheriff's office were also planning on testifying for the prosecution at trial. While the case is distinguishable from the case before us based upon the facts, the significance of the case lies in that court's focus on whether the petitioner presented sufficient evidence to support a finding that prejudice was inherent or so likely as to violate due process pursuant to *Turner*. Unlike *Turner*, the deputies testifying would not have contact with the jurors other than as witnesses. The petitioner incorrectly assumed that jurors would infer that the deputies were more credible witnesses because they work with the deputy serving as the bailiff. The court found that there was no evidence in the record of any constitutional basis to justify the disqualification of the deputy from serving as a bailiff in the petitioner's trial.

Quite simply, the sheriff was a bailiff in the most common sense. The judge duly recognized the unusual nature of the circumstances and informed the sheriff that his duties included escorting the jury in and out of the courtroom in addition to accepting messages from the jury and bringing such messages to the attention of the court. The judge reminded the sheriff that he was prohibited from having any contact or conversation whatsoever with members of the jury. The record is devoid of any indication that the sheriff conducted himself in any other manner than what was ordered.

With that in mind, we turn to the role of the sheriff in his capacity as a State's witness and the weight his testimony may have carried in obtaining a conviction. This is the more critical stage of analysis because of the sheriff's role as an investigating officer in this case. Basically, the sheriff testified as to what he observed and heard once he was called to the scene of the crime. He was the first to arrive at the scene where he was approached by a woman (Ms. Melrath) screaming for him to hurry because a man was dying. He was then approached by the appellant who confessed to shooting the victim. He tended to the victim and obtained possession of the weapon. He advised the appellant of his rights, and as he was doing so, the appellant repeated his confession. He then called for an ambulance and turned the case over to Trooper Garrett. Trooper Garrett corroborated much of Sheriff Stemple's testimony in that he saw, heard or discovered much of the same evidence and offered additional testimony.

We deem Sheriff Stemple's testimony to be corroborative and cumulative of other evidence in the case. However, as one of the investigating officers in the case, we cannot say that Sheriff Stemple was a "minor" witness for the prosecution. *See Radford,* 426 S.E.2d at 869. While the conviction, based upon a thorough review of the record, could have probably been sustained without Sheriff Stemple's testimony, it should also be said

that the sheriff's testimony alone is quite persuasive.

In understanding the serious nature of this situation, we are guided by Rule 605 of the *West Virginia Rules of Evidence* which provides, in relevant part, that "[t]he judge presiding at the trial *shall* not testify in that trial as a witness." (emphasis added). In syllabus points 2 and 3 of *In Re Pauley,* 173 W.Va. 228, 314 S.E.2d 391 (1983), this Court recognized the bailiff's role as one of servant to the judge and to the court:

> 2. A bailiff is an officer of the court to which he or she is assigned, subject to its control and supervision, and responsible for preserving order and decorum, taking charge of the jury, guarding prisoners, and other services which are reasonably necessary for the court's proper functioning.

> 3. The bailiff's crucial role in maintaining order in the courtroom requires his or her undivided loyalty and allegiance to the judge whom he or she serves.

Clearly, the bailiff, in his capacity as attendant to the judge, is an extension of the court.

An analogous situation that is helpful in our examination of the situation before us is found in the case *Kennedy v. Great Atlantic & Pacific Tea Co., Inc.,* 551 F.2d 593 (5th Cir.1977). In that case, the presiding judge's law clerk was permitted to testify at trial as to what he observed upon investigation of the scene where the accident in litigation had occurred. The court therein believed "it was [the law clerk's] duty as much as that of the trial judge to avoid any contacts outside the record that might affect the outcome of the litigation." *Id.* at 596. The court cited Rule 605 of the *Federal Rules of Evidence* and favorably noted a party's contention that such rule has equal applicability to the giving of testimony at trial by a law clerk of the presiding judge.[2] The court reasoned that some significance had to have been attached to the testimony of the judge's law clerk. More specifically, the court stated "there was

---

2. Rule 605 of the *Federal Rules of Evidence* provides, in pertinent part, that "[t]he judge presiding at the trial *may* not testify in that trial as a witness." (emphasis added). The only difference in the federal version and the West Virginia

version of Rule 605 is in West Virginia the word "shall" is used to "absolutely disqualify" the judge from testifying. 1 Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 6–5, (3d ed. 1994).

the imprimatur of character, credibility and reliability that was automatically implied as coming from the court itself when the trial judge introduced the witness as his present law clerk." *Id.* at 598.

Judicial integrity is the policy rationale behind Rule 605 in general. 1 Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 6–5 (3d ed. 1994). The *Kennedy* case suggests that the court and its staff carry an aura of credibility. By this clearest analogy, if the judge presiding over the trial may not testify at that trial, the bailiff should be similarly restrained.

It is imperative to the preservation of our adversarial system of criminal justice that the neutral role of the court be kept separate and apart from the prosecution and the defense. After all, it is within the criminal arena that an individual's basic rights can be most jeopardized. We, therefore, are of the opinion that the invocation of the principles announced in *Turner* are appropriate in the case now before us in light of the fact that the sheriff, in his capacity as a bailiff and as a witness for the prosecution, could be considered a key witness because he was an investigating officer at the crime scene.

■ Therefore, we hold that a defendant's constitutional rights to due process and trial by a fair and impartial jury, pursuant to amendment VI and amendment XIV, section 1 of the *United States Constitution* and article III, sections 10 and 14 of the *West Virginia Constitution* are violated when a sheriff, in a defendant's trial, serves as a bailiff and testifies as a key witness for the State in that trial.

As the United States Supreme Court later noted, in *Gonzales, supra, Turner* did not set down an absolute prohibition of the type of situation presented herein. The court in *Turner* found reversal proper because of the close and continual association the jurors had with key witnesses that led to a relationship that fostered jurors' confidence and deprived the defendant of his constitutional right to trial by an impartial jury.

A question remains whether the constitutional error is harmless. Where constitutional rights are involved, the United States Su-

preme Court in *Fahy v. Connecticut,* 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963), set forth the federal standard in regard to harmless constitutional error. The paramount question that must be answered in making this determination is "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Id.* at 86–7, 84 S.Ct. at 230, 11 L.Ed.2d at 173.

Shortly thereafter, the Court revisited *Fahy* in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The court noted its rule and not the state's rule is controlling when constitutional errors are raised. In relying upon *Fahy,* the court reiterated that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Id.* at 24, 87 S.Ct. at 828, 17 L.Ed.2d at 710–11.

■ Our adoption of this standard was pronounced in *State v. Thomas,* 157 W.Va. 640, 203 S.E.2d 445 (1974). We held in syllabus point 20 of *Thomas* that: "Errors involving deprivation of constitutional rights will be regarded as harmless only if there is no reasonable possibility that the violation contributed to the conviction."

■ Applying the above principles to this case, we conclude that the constitutional error in this case is not harmless. Clearly, upon reviewing the evidence, there is a reasonable possibility that the violation in this case contributed to the conviction.

The judgment of the Circuit Court of Calhoun County is reversed and this case is remanded for further proceedings consistent with this opinion.

Reversed and remanded.

BROTHERTON, C.J., did not participate.

MILLER, Retired Justice, sitting by temporary assignment.