650 S.E.2d 149

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Allen Dewayne WAUGH, Defendant Below, Appellant.**

No. 32773.

Supreme Court of Appeals of West Virginia.

Submitted: Jan. 10, 2007.

Decided: Feb. 16, 2007.

Darrell V. McGraw, Jr., Attorney General, Barbara H. Allen, Assistant Attorney General, Charleston, for the Appellee.

Kevin W. Hughart, Sissonville, for the Appellant.

PER CURIAM.

Appellant Allen D. Waugh seeks a new trial in connection with his conviction for second degree murder in 1999 [1] on grounds

---

1. Due to the withdrawal of Appellant's trial counsel because of election to public office prior to the filing of an appeal brief, and the subsequent withdrawal of the second attorney appointed to represent Appellant, it was necessary for Mr. Waugh to be resentenced on December 10,

that a deputy sheriff, who testified for the State at trial, had improper contact with the jury panel while acting as a bailiff and that the trial court improperly rehabilitated one of the State's witnesses following her cross examination. Although this case raises valid concerns with regard to the actions at issue, we do not find that the deputy sheriff's limited exercise of bailiff duties in this case resulted in a violation of Appellant's right to due process or a denial to Appellant of a trial by a fair and impartial jury. And, while the trial court's questioning of the victim's mother was arguably inappropriate in both scope and duration, we do not find that the judicial examination amounted to plain error on the facts of this case. Accordingly, we affirm.

## I. Factual and Procedural Background

On the evening of December 19, 1997, Appellant and the victim, Ronald Plumley, were both at the Dallas Bar. The neighborhood bar was filled with people as it was karaoke night. Before the murder of Mr. Plumley occurred, Appellant had been asked by Dallas Howard, the owner of the bar, to leave because he was harassing another customer. Mr. Howard asked both the Appellant and his brother, Daniel, to leave the bar. While Appellant and his brother apparently did leave the bar, they later returned to the bar and Appellant became embroiled in another disturbance.

The victim, Mr. Plumley, had approached the bar area to get some quarters because he, his brother, and his mother were all playing pool. According to the testimony of Mr. Howard, the following exchange occurred when the victim overheard Mr. Howard again demand that Appellant and his brother leave the bar:

> He [the victim] told Allen [Appellant], . . . "Allen, why don't you guys go ahead and leave." He [the victim] said, "The man [Mr. Howard] asked you to leave." He [the victim] said, "He don't have no problem in this bar."

He [the victim] said whatever you got in your pocket—because Allen had his hand behind his back. He said, "Whatever you got in your pocket, just leave it in there." And Allen—Allen told him, he said, "Well, I've got it." And he [the victim] said, "Well, you guys just go ahead and leave." He said, "Whatever you got in your pocket, just go ahead and leave it there."

> And he [Appellant] took another step backwards and pulled that pistol out, both hands, just like that. . . . And when he pulled that pistol out, he brought it around just like that and fired it. And I knew it hit Ronnie [the victim] bad.

Mr. Howard testified that the victim had not made any verbal threats or threatening gestures of any kind to Appellant before the shooting incident. Immediately after the shooting, Appellant "flashed his gun around through the bar . . . and backed out the door and left."[2] The victim died at the scene before the emergency unit arrived.

In May 1998, the Mason County Grand Jury returned a one-count indictment against Appellant, charging him with murder. At the conclusion of the trial, which began on August 17, 1999, the jury found Appellant guilty of second-degree murder. He was sentenced on May 15, 2000, to a definite term of 30 years for the murder of Mr. Plumley.[3] As grounds for this appeal, Appellant asserts that the trial court committed error by allowing a sheriff's deputy, who was a witness for the State, to serve as a bailiff during the trial and that the trial court wrongly rehabilitated the credibility of the victim's mother following her cross-examination.

## II. Standard of Review

With regard to Appellant's assignment of error that the trial court abused its discretion in denying his motion to dismiss the entire jury panel before the trial began, we apply the following standard of review:

> In reviewing challenges to the findings and conclusions of the circuit court, we

2004, to permit a timely appeal. Current counsel filed a Notice of Intent to Appeal on January 7, 2005.

2. Mr. Howard testified to the manner in which Appellant departed the bar after the shooting.

3. As noted above, Appellant was resentenced on December 10, 2004, for purposes of allowing him to perfect his appeal in a timely fashion. See, supra, note 1.

apply a two-prong deferential standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

Syl. Pt. 2, *Walker v. West Virginia Ethics Com'n,* 201 W.Va. 108, 492 S.E.2d 167 (1997). With regard to the assignment that the trial court committed plain error by wrongly rehabilitating a witness, the following standard is applicable as this issue was not preserved below:

An unpreserved error is deemed plain and affects substantial rights only if the reviewing court finds the lower court skewed the fundamental fairness or basic integrity of the proceedings in some major respect. In clear terms, the plain error rule should be exercised only to avoid a miscarriage of justice. The discretionary authority of this Court invoked by lesser errors should be exercised sparingly and should be reserved for the correction of those few errors that seriously affect the fairness, integrity, or public reputation of the judicial proceedings.

Syl. Pt. 7, *State v. LaRock,* 196 W.Va. 294, 470 S.E.2d 613 (1996). With these standards in mind, we proceed to determine whether the trial court committed reversible error.

### III. Discussion

### A. Prosecution Witness/Bailiff

■ Appellant asserts that error was committed by allowing Deputy R.L. Bennett, who testified on behalf of the State, to escort jury members into the jury room and to operate the metal detector that was at the entrance to the court room. Immediately after the jury was impaneled, Appellant's trial counsel objected to the entire jury panel based on Deputy Bennett's contact with the jurors. The trial court held an *in camera* hearing to address the amount of contact Deputy Bennett had with the jurors. In explanation of the extent of the contact, Deputy Bennett testified to the following:

Witness: I was told to set up the metal detector outside of the doors. So I set it up.

Court: Who told you to do that?

Witness: I think it was Danny Pearson said that it had been requested that I set up the metal detector.

Court: He didn't say who requested that?

Witness: No, he didn't. Not that I can recall.

Court: Did you set it at the entrance to this courtroom?

Witness: Yes, sir.

Court: Do you remember if any jurors passed through that detector?

Witness: No, sir. I didn't run any jurors through the detector.

Court: None at all?

Witness: Not through the detector.

Court: Well, I take it the jurors c[a]me to this courtroom while you had the detector?

Witness: They were sitting in the hallway.

Court: Did you tell them to sit in the hallway or did they just sit on the chairs?

Witness: They were sitting in the chairs there. It got to be quite a few of them. So I took them down there to the jury room.

Court: And left them?

Witness: Right. I took them to the jury room. And once it got filled, I put the rest in the law library.

Court: Is that the extent of what you did?

Witness: Yes, sir.

Court: Did you give them any orders or anything like that?

Witness: No, I just told them if they were jurors, to go down to the end of the hallway, last door on the right.

■ To support his contention that he was denied a fair trial as the result of Deputy Bennett serving as both witness and bailiff, Appellant relies on syllabus point three of *State v. Kelley,* 192 W.Va. 124, 451 S.E.2d 425 (1994), in which this Court held:

A defendant's constitutional rights to due process and trial by a fair and impartial jury, pursuant to amendment VI and amendment XIV, section 1 of the *United States Constitution* and article III, sections 10 and 14 of the *West Virginia Con-*

*stitution* are violated when a sheriff, in a defendant's trial, serves as a bailiff and testifies as a key witness for the State in that trial.

The issue of whether constitutional error occurred in this case is determined under *Kelley* by examining first, whether Deputy Bennett was serving as a bailiff while performing the duties described above, and second, whether the testimony he provided at trial was that of a key witness with regard to securing Appellant's conviction.

That the metal detection and escorting functions performed by Deputy Bennett are prototypical of actions performed by a bailiff cannot be disputed. What is disputed, however, is whether the amount of time Deputy Bennett was involved in these functions was significant enough to spark the concerns at issue in *Kelley*. Appellant argues that the contact that Deputy Bennett had with the jurors in escorting them down the hall to either the jury room or the library was ingratiating in nature and contributed to giving him an "aura of credibility" when he took the stand and testified. 192 W.Va. at 130, 451 S.E.2d at 431. Conversely, the State contends that the limited contact Deputy Bennett had with the jurors was not sufficient to raise constitutional concerns, as was the case in *Kelley* where the officer involved served as bailiff throughout the entirety of the trial proceedings.

Given the unusual situation of having a witness also serve as the bailiff,[4] the trial court instructed the sheriff in *Kelley* that he was not to converse with the jurors and that his contact with the panel was to be limited to escorting the jury members in and out of the courtroom and transporting messages between the jury and the court.[5] Because the record failed to indicate that the officer acted other than as instructed, this Court found no

*per se* constitutional violation based on the sheriff serving as the bailiff during the trial. Of more concern to this Court was "the role of the sheriff in his capacity as a State's witness and the weight his testimony may have carried in obtaining a conviction." 192 W.Va. at 129, 451 S.E.2d at 430. We viewed this issue as the "more critical stage of analysis because of the sheriff's role as an investigating officer in this case." *Id.* at 129, 451 S.E.2d at 430.

In examining the role the sheriff occupied as a witness in *Kelley*, we looked to the extent of his involvement with the investigation of the case. As the first officer on the scene, the sheriff in *Kelley* obtained possession of the murder weapon and he attended to the victim. At trial, the sheriff's testimony included a description of the events at the scene,[6] as well as the fact that the defendant twice confessed to the sheriff to shooting the victim.[7] We determined in *Kelley* that the sheriff's testimony was corroborative and cumulative of other evidence presented at trial. Due to the scope and persuasiveness of his testimony, however, we could not conclude that the sheriff's testimony was that of a minor witness. 192 W.Va. at 129–30, 451 S.E.2d at 430–31.

As was the case in *Kelley*, the officer involved in this case was the first officer who arrived on the scene. Deputy Bennett was there for fifteen to thirty minutes before Deputy Carl Peterson arrived and took over the investigation. Before Officer Peterson's arrival, Deputy Bennett secured the scene; called for an ambulance; took several Polaroid photographs of the crime scene; and retrieved one shell casing. He also took statements from two witnesses.

At trial, the most important piece of noncumulative evidence that Deputy Bennett testified to was the chain of custody with

---

**4.** This was necessary due to the unavailability of any other deputies to serve as bailiff.

**5.** The record in this case indicates that the prosecutor instructed Deputy Bennett "not to have any contact with the jury other than the fact he was running the metal detector out front."

**6.** During his direct testimony, Deputy Bennett testified that upon his arrival at the bar he immediately recognized the victim, having known him

since he was a child. Deputy Bennett's testimony does not indicate whether the victim and the officer were close friends or merely acquaintances.

**7.** One confession occurred before the officer administered *Miranda* rights to the defendant and one took place after the explanation of these rights.

regard to the shell casing. This issue, standing on its own, however, is not sufficient under the facts of this case to render Deputy Bennett a key witness under the reasoning of *Kelley*. In reaching our decision in *Kelley*, we discussed a number of both federal and state court decisions in which the impact of a prosecution witness also serving as bailiff was examined. One of those decisions was *Strickland v. State*, 784 S.W.2d 549 (Tx.App. 1990), a case in which a sheriff who served as the bailiff at trial testified to the chain of custody of certain pieces of evidence. In concluding that no constitutional violations occurred, the Texas appellate court reasoned that the sheriff "could not be considered a key witness because his testimony was not a significant factor in arriving at a conviction." 192 W.Va. at 128, 451 S.E.2d at 429 (discussing *Strickland* ).

 As we emphasized in *Kelley*, there is no automatic requirement that mandates the reversal of a conviction whenever a witness for the State comes into contact with the jury. 192 W.Va. at 127, 451 S.E.2d at 428 (quoting *Gonzales v. Beto*, 405 U.S. 1052, 1054–55, 92 S.Ct. 1503, 31 L.Ed.2d 787 (1972)). Instead, what is required is a factual analysis that focuses on the length and degree of contact between the jury and the witness, as well as an inquiry into whether the witness provided testimony that was crucial to the conviction, or merely formal in nature. In those cases where the testimony involved was " 'confined to some uncontroverted or merely formal aspect of the case for the prosecution,' " the testimony is typically not viewed as crucial. 192 W.Va. at 127, 451 S.E.2d at 428 (quoting *Gonzales*, 405 U.S. at 1054–55, 92 S.Ct. 1503). Rather than being concerned with the " 'brief encounters' " that are "often inevitable" between witnesses and jury members, the type of contact that initially prompts inquiry into the issue of whether the defendant was provided a fair trial is present when the contact is close and sustained due to the bailiff being the "official guardian" of the jurors. 192 W.Va. at 127, 451 S.E.2d at 428 (quoting and discussing *Gonzales*, 405 U.S. at 1054–55, 92 S.Ct. 1503). And, to constitute an issue which rises to the level of constitutional significance, the bailiff/witness's testimony must be crucial to the conviction. 192 W.Va. at 127, 451 S.E.2d at 428.

 As we explained in *Kelley*, the type of contact that raises constitutional flags exists where the jurors have a "close and continual association . . . with key witnesses that le[a]d[s] to a relationship that fostered jurors' confidence and deprived the defendant of his constitutional right to trial by an impartial jury." 192 W.Va. at 130, 451 S.E.2d at 431 (discussing *Gonzales*). We cannot conclude, under the holding and reasoning of *Kelley*, that the limited contact that Deputy Bennett had with the jurors in this case resulted in the jury viewing him as their "official guardian." *See id.* And, despite Deputy Bennett being the first officer on the scene, the subject matter of his testimony was corroborative and cumulative as Deputy Peterson, the investigating officer, testified to the scene of the crime and the events surrounding the investigation at trial. As far as the chain of custody testimony with regard to the single shell casing that Deputy Bennett retrieved, that testimony was essentially uncontroverted and constituted a formal aspect of the State's case.[8] Because we conclude that the testimony of Deputy Bennett was not that of a key witness within the meaning of *Kelley*, we do not find that Appellant's constitutional rights were violated by virtue of Deputy Bennett's involvement in this case as both a prosecution witness and a bailiff.

### B. Witness Rehabilitation

 Appellant contends that the trial court wrongly questioned Mrs. Plumley, the

---

**8.** As the Texas Court decided in *Strickland*, we similarly conclude that the testimony Deputy Bennett provided with regard to the shell casing chain of custody was not a critical piece of evidence used to convict Appellant under the facts of this case. *See Kelley*, 192 W.Va. at 128, 451 S.E.2d at 429 (discussing *Strickland*, 784 S.W.2d 549). Given the large number of people who witnessed the shooting and the fact that there was only one shot fired from Appellant's gun, there was no dispute as to who shot the victim in this case or from whose gun the shot was fired. Consequently, the chain of custody evidence concerning the shell, while necessary for evidentiary purposes, was not crucial for purposes of establishing the identity of the murderer.

victim's mother, in an attempt to rehabilitate her credibility. The following is the exchange about which he complains:

Court: All right, Mrs. Plumley, I want to ask you some questions. What is the date of your birth?

Witness: 10/15/53.

Court: Wait a minute now. Ten what?

Witness: 10/15/53.

Court: How old were you on this night of December?

Witness: Forty-three.

Court: And do you have additional sons as well as Shawn and your son that was killed? Do you have any more boys?

Witness: No, sir.

Court: On that December day, do you recall what time you got up in the morning? The usual time?

Witness: Yes.

Court: What time was that?

Witness: About between 7:00 and 7:30.

Court: What time?

Witness: 7:00, 7:30.

Court: Okay. Did you do your housework that day? What did you do on that day? Did you work?

Witness: No. I was living with my cousin at the time.

Court: All right. And I think you told me but I lost my notes. About what time did you get down to the bar?

Witness: Between 10:30 and 11:00.

Court: All right. And the shooting occurred when to your best knowledge?

Witness: Five till 1:00.

Court: Almost 1:00?

Witness: Yes, sir.

Court: You had been down there a couple hours, right?

Witness: Yes, sir.

Court: And in that process—and I hate to remind you—you lost a son, didn't you?

Witness: Yes, sir.

Court: Saw your son shot down, is that right?

Witness: Yes, sir.

Court: You went to the hospital?

Witness: Yes, sir.

Court: With your son?

Witness: Yes, sir.

Court: I dare say you prayed on the way?

Witness: Yes, sir.

Court: And how long was your son in the hospital before they told you that he was dead? Got any idea?

Witness: It was about an hour and a half to two hours.

Court: Then the officer, the deputy began to quiz you and ask you questions?

Witness: Yes, sir.

Court: How long had your son been dead when the officer questioned you? Hour? Two hours? What would you tell me?

Witness: I'd say between three hours.

Court: Were you possessed at that time of all your faculties in view of what you went through?

Witness: I don't understand the question.

Court: All right. Did you know everything you were saying when you tried to answer the deputy's questions?

Witness: I did the best I could do.

Court: Pardon?

Witness: I did the best I could do.

Court: Well, were you level headed and calm and collected?

Witness: Not with my son lying there dead, no.

Court: Did the deputy offer to question you later after you could go home and get some rest and get your head screwed on right?

Witness: When he took me to the room, I asked him if I could wait until the next morning. And he said no.

Court: It had been—what is it, about 20 hours since you got any rest? You got up at 7:00 and he questioned you at 3:00.

Witness: Yes, sir.

Court: All right. That's all the questions I have.

As we recognized in syllabus point three of *State v. Farmer*, 200 W.Va. 507, 490 S.E.2d 326 (1997), "[t]he plain language of Rule 614(b) of the West Virginia

Rules of Evidence authorizes trial courts to question witnesses—provided that such questioning is done in an impartial manner so as to not prejudice the parties."[9] We further recognized in *Farmer* that "[a] trial court must exercise its sound discretion when questioning a witness pursuant to Rule 614(b) of the West Virginia Rules of Evidence." *Farmer*, 200 W.Va. at 508, 490 S.E.2d at 327, syl. pt. 1, in part.

Appellant argues that the trial court wrongly questioned Mrs. Plumley for the purpose of rehabilitating her testimony. He contends that the trial court specifically engaged in the questioning quoted above to "explain" the discrepancies between her testimony at trial and her statement given to a sheriff's deputy after the murder. The discrepancies to which Appellant refers pertain to whether or not she saw the murder weapon prior to its use and whether she overheard an argument between her son and the victim. Appellant suggests that the examination was improper and that its aim was to garner pity from the jury.

The State maintains that Appellant selectively cites transcript references to suggest testimonial discrepancies that in fact do not exist.[10] Refuting the alleged inconsistencies in Mrs. Plumley's statement, the State contends that rather than being rehabilitative in nature, the trial court's examination was aimed at trying "to make Mrs. Plumley feel better about herself, as the mother of the victim, given the fact defense counsel had berated her so harshly on cross."

 It is axiomatic that "[a] trial judge in a criminal case has a right to control the orderly process of a trial and may intervene into the trial process for such purpose, so long as such intervention does not operate to prejudice the defendant's case." Syl. Pt. 4, in part, *State v. Burton*, 163 W.Va. 40, 254 S.E.2d 129 (1979). The examination that the trial court undertook with Mrs. Plumley concerned background information relevant to Mrs. Plumley's state of mind on the night of the murder. Whether the trial court was trying to make her "feel better" after her cross-examination or attempting to give the jury additional information for purposes of understanding Mrs. Plumley's mental state when she gave her statement is unclear. Either way, the trial court's queries appear to have exceeded the scope of what this Court has previously recognized to be the proper objective of the type of judicial questioning that is authorized by Rule 614(b). As we recognized in *Alexander ex rel. Ramsey v. Willard*, 208 W.Va. 736, 542 S.E.2d 899 (2000), " '[a] judge may ask questions for the purpose of clearing up points that seem obscure, and supplying omissions which the interest of justice demands, but it is not proper that he conduct an extended examination of any witness.' " *Id.* at 742, 542 S.E.2d at 905 (quoting *Nash v. Fidelity–Phenix Fire Ins. Co.*, 106 W.Va. 672, 679, 146 S.E. 726, 728 (1929)).

In *Willard* we discussed the dangers of a judge proceeding beyond the accepted and traditional province of the trial court and engaging in extensive questioning of a witness. 208 W.Va. at 742–43, 542 S.E.2d at 905–06. As we observed, judicial intrusions of this nature run the risk of confusing the jury and carry the potential for injecting bias into the trial. Given the harm that may result when the trial judge assumes the typically adversarial role of questioning a witness, extended judicial examinations are clearly discouraged in the interest of avoiding the possibility of resulting prejudice and an invasion of the jury's province as trier of the facts.

At the trial of this matter, Appellant failed to raise any objection to the trial court's examination of Mrs. Plumley.[11] He asserts

---

**9.** Rule 614(b) provides that "[t]he court may interrogate witnesses, whether called by itself or by a party, but in jury trials the court's interrogation shall be impartial so as not to prejudice the parties." W.Va.R.Evid.614(b).

**10.** Citing to additional portions of the statement Mrs. Plumley gave to the police on the night of the murder, the State demonstrated that Mrs.

Plumley had included in her statement the fact that she saw Appellant take "a gun out" right before the shooting.

**11.** The State notes that Appellant's trial counsel even referred to the trial judge's examination of Mrs. Plumley in his closing argument when he stated, "You heard the Judge ask her [Mrs. Plumley] some questions about how distraught she

on appeal that the judicial examination rose to the level of plain error, arguing that the trial judge's actions prevented him from receiving a fair trial. Our examination of the record, however, does not compel us to conclude that the jury's determination was likely to have been prejudiced by the trial judge's questioning of Mrs. Plumley. If the judge's objective was to impress upon the jury the fact that Mrs. Plumley was in a highly emotional state at the time she gave her statement to the police after her son had just been murdered, the jury could have reached this same conclusion on their own, as the jury was likely comprised of both mothers and fathers. More importantly, Mrs. Plumley's credibility was not in need of rehabilitation as her testimony was not necessary for the conviction of Appellant. While the trial court's questioning of Mrs. Plumley appears to have diverged from the sanctioned purpose of elucidating information necessary to assist in the orderly progression of the trial and to bring out matters necessary to the interests of justice, it does not appear likely to have "skewed the fundamental fairness or basic integrity of the proceedings in some major respect" that would amount to plain error. *Willard,* 208 W.Va. at 744, 542 S.E.2d at 907 (quoting *LaRock,* 196 W.Va. 294, 470 S.E.2d 613, syl. pt. 7, in part). While we clearly do not approve of the scope of the trial court's questioning of Mrs. Plumley, we cannot conclude that Appellant has demonstrated that the trial court's examination of Mrs. Plumley impacted the integrity of the trial proceedings in a manner which requires that Appellant's conviction be reversed on grounds of plain error.

Based on the foregoing, we affirm the decision of the Circuit Court of Mason County.

Affirmed.

was that night over this event that happened to her son."